**Joseph Dennis Zepeda, a Minor, by Irma M. Flores, His Next Friend, Plaintiff-Appellant, v. Louis Raul Zepeda, Defendant-Appellee.**

### Gen. No. 48,291.

First District, Third Division.

April 3, 1963.

Rehearing denied June 11, 1963.

241

244

Hugh M. Matchett, of Chicago, for appellant.

Max Rheinstein, of Chicago, amicus curiae, for appellee.

MR. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

The plaintiff is the infant son of the defendant. He seeks damages from his father because he is an illegitimate child. He appeals from an order dismissing his suit and striking his complaint for its failure to state a cause of action.

Although the defendant moved to dismiss the complaint in the trial court, he did not contest this appeal. During the oral argument in this court Mr. Hugh M. Matchett, the plaintiff's attorney, said he thought the defendant's viewpoint should be represented. He suggested that Professor Max Rheinstein, an internationally recognized authority in family law, be asked to participate as amicus curiae. Dr. Rheinstein accepted our appointment. We are indebted to Mr. Matchett for his generous suggestion and to Dr. Rheinstein for his gracious acceptance.

The factual averments of the complaint, which were admitted by the motion to strike, are: the defendant is the plaintiff's father; the defendant induced the plaintiff's mother to have sexual relations by promising to marry her; this promise was not kept and could not be kept because, unbeknown to the mother, the defendant was already married. The com-

245

plaint charges that the promise was fraudulent, that the acts of the defendant were willful and that the defendant injured the plaintiff in his person, property and reputation by causing him to be born an adulterine bastard. The plaintiff seeks damages for the deprivation of his right to be a legitimate child, to have a normal home, to have a legal father, to inherit from his father, to inherit from his paternal ancestors and for being stigmatized as a bastard.

In describing this complaint, Dr. Rheinstein stated:

> "Such a claim is novel. There is no statutory or judicial recognition of such a claim in Illinois or elsewhere in the United States. There is no adverse decision either. In fact, no such claim seems ever to have been raised in any court in Illinois, of any other Common Law jurisdiction, or in any Civil Law country either."

■■ The plaintiff raises constitutional questions and presents two theories of recovery, one in tort and the other in contract. The constitutional questions are framed under the due process and equal protection clauses of the Constitution of the United States (XIV Amendment, section 1), the due process clause of the Constitution of Illinois (Article II, section 2) and under Article II, section 19 of the State Constitution ("Every person ought to find a certain remedy in the laws for all injuries or wrongs which he may receive in his person, property or reputation"). These constitutional questions cannot be considered. The plaintiff appealed directly to the Supreme Court which refused to take the case and transferred it to this court. If a case in which constitutional issues are advanced is transferred to the Appellate Court, it must be concluded that the Supreme Court has determined no such issues are involved or that they are not material to the disposition of the appeal. City

246

of Chicago v. Campbell, 27 Ill App2d 456, 170 NE2d 19.

The contract theory is that the plaintiff should be regarded as a third-party beneficiary of the agreement made by his father and mother to marry each other. This contention, even if it were tenable, is not available to the plaintiff because his complaint sounds in tort. Therefore, the only theory of recovery to be considered on this appeal is whether the complaint states a cause of action in tort.

The first of the many interesting questions prompted by the unique averments of the complaint is this: was the act of the defendant a legal wrong, a tortious act? From the admitted facts we can draw the conclusion that the defendant's act was willful and, perhaps, criminal. It was willful in that the defendant was completely indifferent to the foreseeable consequences of his act. He pursued a course of conduct which showed a conscious disregard for the rights of others. He knew he could not marry the woman and he knew that if a child were born as a result of his act he could not legitimatize that child. The act may have been criminal in that the defendant, a married man, and the mother, an unmarried woman, were living together in the mother's apartment. If this cohabitation as husband and wife was openly done, it was a criminal offense: adultery on the part of the defendant, fornication on the part of the mother. Ill Rev Stats (1957), c 38, § 46; People v. Greene, 276 Ill 346, 114 NE 518. The criminal aspect of the act accentuates its gravity. It was not only a moral wrong but was, under the aggravated circumstances of this case, tortious in its nature.

We need not be concerned whether a tort was committed upon the mother by the defendant's false promise of marriage which induced her to have intercourse with him. Our problem is whether a tort was com-

mitted upon the child. Thus, the second question to confront us is, can a tort be inflicted upon a being simultaneously with its conception?

 The law of torts has been hesitant in recognizing what medical science has long known, that life begins at the moment of conception, and what theology has longer taught, that from the moment of conception every human being has the rights of a human person. Blackstone wrote that in the contemplation of the common law a child's life began when it "is able to stir in the mother's womb." Cooley, Blackstone's Commentaries, c 1, p 130 (1899). Although other branches of the law, such as property and inheritance, recognized the legal existence of a child from the moment of conception, in tort a child was not regarded as a being separate from its mother until it was born. In the last few years a change has taken place in the law pertaining to prenatal physical injuries. From 1884 to 1946 it was universally held that under the common law there could be no recovery for such injuries. Dietrich v. Inhabitants of Northhampton, 138 Mass 14 (1884); Allaire v. St. Luke's Hospital, 184 Ill 359, 56 NE 638 (1900). There were occasional dissenting opinions; judges were troubled by the unfairness of holding that a child en ventre sa mere was a human being for inheritance and property rights and not one if it suffered tortious physical injury. It was not until 1946 that a major breakthrough was made under the common law (Bonbrest v. Kotz, 65 F Supp 138) although one that received less attention had occurred in 1924 (Kine v. Zuckerman, 4 Pa D & C 227). Gradually thereafter various jurisdictions permitted actions for prenatal injuries if a child was viable at the time of injury and if it survived birth. Amann v. Faidy, 415 Ill 422, 114 NE2d 412 (1953). A few states adhered to the Dietrich precedent, but generally the viability of the child at the time

of injury became the criterion upon which recovery rested. However, the exact time when viability occurs is uncertain. No medical authority can say with accuracy just at what moment a child can live when separated from its mother. Babies have survived in incubators ever further removed from the time of normal birth. The law has slowly come to realize these uncertainties and the viability test is being abandoned. Now complaints are being sustained where the pleaded facts show that the child was not, or might not have been, viable when the injury occurred. Daley v. Meier, 33 Ill App2d 218, 178 NE2d 691 (1961), mother approximately one month pregnant; Smith v. Brennan, 31 NJ 353, 157 A2d 497 (1960); Sinkler v. Kneale, 401 Pa 267, 164 A2d 93 (1960), first month of pregnancy; Bennett v. Hymers, 101 NH 483, 147 A2d 108 (1958); Hornbuckle v. Plantation Pipe Line Co., 212 Ga 504, 93 SE2d 727 (1956), six weeks after conception; Kelly v. Gregory, 282 App Div 542, 125 NYS2d 696 (1953), third month of pregnancy; Damasiewicz v. Gorsuch, 197 Md 417, 79 A2d 550 (1951).

The case at bar seems to be the natural result of the present course of the law permitting actions for physical injury ever closer to the moment of conception. In point of time it goes just a little further. The significance of this course to us is this: if recovery is to be permitted an infant injured one month after conception, why not if injured one week after, one minute after, or at the moment of conception? It is inevitable that the date will be further retrogressed. How can the law distinguish the day to day development of life? If there is human life, proved by subsequent birth, then that human life has the same rights at the time of conception as it has at any time thereafter. There cannot be absolutes in the minute to

minute progress of life from sperm and ovum to cell, to embryo to foetus, to child.

But what if the wrongful conduct takes place before conception? Can the defendant be held accountable if his act was completed before the plaintiff was conceived? Yes, for it is possible to incur, as Justice Holmes phrased it in the Dietrich case, "a conditional prospective liability in tort to one not yet in being." It makes no difference how much time elapses between a wrongful act and a resulting injury if there is a causal relation between them. Let us take the hypothetical case of an infant injured after birth by a defective household device. Suppose, before the child was conceived, a manufacturer negligently made a space heater and sold it to a retailer who retained it in his store. After the infant's birth his mother purchased the heater and used it in the room of her child who was burned because of its faulty preparation. Would there not be a right of action against the manufacturer despite the fact the negligence took place before the child was conceived? In the hypothetical case the child was injured after birth. Lest this fact be given undue importance, let us proceed a step further. Suppose a manufacturer prepared and sold a drug for human consumption which had not been adequately tested; that, while it was beneficial for the purpose intended, it proved to be harmful if taken by women in the very early stage of pregnancy in that it arrested the development of infants' bodies, causing them to be born with abnormal arms or legs. Would not a child so born have a right of action in tort? In the second case the child was injured soon after conception. So let us go still further and take a third suppositive case, where the wrongful act also takes place before conception but the injury attaches at the moment of conception. Physicists and geneticists declare that thermonuclear radiation can so af-

fect the reproductive cells of future parents that their offspring may be born with physical and mental defects. Schubert and Lapp, Radiation—What It Is And How It Affects You, p 181 (1957); Crow, The Genetic Effects Of Radiation, p 20, Bulletin Of Atomic Scientists (January 1958); Grobman, Our Atomic Heritage, pp 68, 135 (1951); Weaver, Radiations And The Genetic Threat, p 733, Treasury of Science (1958). If a child is born malformed or an imbecile because of the genetic effect on his father and mother of a negligently or intentionally caused atomic explosion, will he be denied recovery because he was not in being at the time of the explosion?

██ In the above three hypothetical cases the injuries suffered were physical. However, the injury resulting from a wrong committed before conception need not be physical. In Piper v. Hoard, 107 NY 73, 13 NE 626 (1887), a girl over twenty years of age was permitted to maintain an action for financial damage suffered by her as a result of a fraud perpetrated on her mother before the mother's marriage and her own conception. Two brothers, Frederick and James Piper, inherited a farm from their father. The father's will provided that if Frederick should die without lawful issue his portion of the estate should go to James and James' heirs. Frederick conveyed his interest to the defendant, John Hoard. In order to prevent James from obtaining this part of the farm, Hoard, concealing his ownership, induced Catherine Hagel to marry Frederick by representing to her that the property was Frederick's and that if she married him and had an heir, the farm would go to the heir. Catherine married Frederick and they had one child. That child, the plaintiff, sued Hoard for the part of the farm he had obtained from Frederick and which he then occupied. Her father had died 15 years after her birth and the suit was commenced several years

251

thereafter. She asked that Hoard's deed be set aside and that she be declared the owner because her mother was induced by his false and fraudulent representations to marry Frederick.

The defendant's demurrer to the complaint was overruled. He stood upon his demurrer and judgment was entered against him. The Court of Appeals of New York affirmed the judgment. The court stated that by his demurrer the defendant admitted that,

> ". . . he procured the fee of the farm (through this marriage) owned by the plaintiff's father by means of his own fraudulent representations, yet claims . . . that plaintiff was not induced to any action by reason of his fraud, and sustained no legal damage therefrom, and cannot, therefore, recover any from him. . . .

> "It is true, the plaintiff was not born when the fraudulent representations were made. Still they were made by the defendant to the plaintiff's mother for the purpose of inducing a marriage between her parents, and if they had been true, the plaintiff would have been the owner of this particular property. In this way she is the very person injured by the fraud, and although not individually in the mind of the defendant when he perpetrated that fraud, yet, as filling the position of heir to her father, she belongs to the class which defendant had in contemplation when he represented to the mother that the heir of Frederick would have the farm. In this way it may be claimed that defendant had in view the plaintiff, and the rights he alleged she would have. Why should not the plaintiff be permitted to hold the defendant to his representations?"

Returning to the present case, we have seen that it is not too important whether the plaintiff's life began

252

during or subsequent to the act of procreation. There is no certainty as to the exact moment conception takes place. It occurs when the male semen contacts and fertilizes the female ovum and this may happen at the time of coition or within a few hours thereafter. Goodrich, Natural Childbirth, p 52 (1950); Maloy, Legal Anatomy and Surgery, 2nd ed, p 668 (1955); A. S. Parks, Marshall's Physiology of Reproduction, 3rd ed, vol 1, p 315 (1960); Parker, The Seven Ages of Woman, p 198 (1960). If the plaintiff was conceived before the completion of the act he became a living, human organism concurrently with the wrongful act. If his conception took place after the act, he was a potential being with essential reality at the time of the act. The seed was planted, the life process was started, life ensued and birth followed. The defendant's wrongful act simultaneously procreated the being whom it injured.

█ In neither event was the plaintiff a "person" as that word has been historically understood in the law of torts. We do not think this is too material for we are not concerned with some abstract ontological proposition as to the instant a human entity becomes a person. The plaintiff is a person now and he was a potential person will full capacity for independent existence at the time of the original wrong. As he developed biologically from potentiality to reality the wrong developed too. It progressed as did he, from essence to existence. When he became a person the nature of the wrong became fixed. From a moral wrong and a criminal act against the public, it became a legal wrong and a tortious act against the individual.

██ This brings us to the next question to be considered, the character of the plaintiff's injury. Injuries other than physical or to property are compensable in law and the plaintiff in the case at bar en-

253

deavors to come within the coverage of two of them: mental suffering and defamation. This court, in the first case in Illinois involving the right of privacy, considered the interrelationship between right of privacy and mental suffering and concluded that actions were permissible for intentionally caused mental suffering. Eick v. Perk Dog Food Co., 347 Ill App 293, 106 NE2d 742 (1952). In Knierim v. Izzo, 22 Ill2d 73, 174 NE2d 157 (1961), a complaint was upheld where the cause of action was based upon the mental anguish of the plaintiff occasioned by the threat of the defendant to kill her husband and the carrying out of this threat. The court held that peace of mind was an interest of sufficient importance to receive protection from the law against intentional invasion. The present complaint, however, does not charge mental distress. The nearest approach to this is the allegation that "His father has wilfully injured and wronged him . . . in stigmatizing him as an adulterine bastard." To some persons the shame of being an adulterine bastard might cause as genuine and severe emotional distress as that resulting from other serious provocation. However, in the absence of proper and adequate averments, we must hold that the complaint states no cause of action for this tort. If it did outline such an action, it would be an interesting speculation whether a charge of mental distress and emotional suffering could be made and sustained in behalf of an infant.

Likewise, the complaint does not state a cause of action for defamation. The averment that the plaintiff has been damaged in reputation is akin to this tort because defamation is the invasion of reputation and good name; but to be actionable the derogatory appellation or statement must have been communicated by the defendant to third persons, and there is no allegation of publication. Also ignored is

the fact that the truth, if published under certain conditions (with good motives and for justifiable ends), can be a complete defense to the charge. Constitution of Illinois, Art II, sec 4. The complaint, which is based on the truth, does not negative the conditions.

The plaintiff further complains of being deprived of the normal home that might have been his and of equality with the legitimate child he might have been. A legitimate child has the natural right to be wanted, loved and cared for. He also has an interest in preserving his family life and he may protect this interest against outside disturbance. Johnson v. Luhman, 330 Ill App 598, 71 NE2d 810. However, a legitimate child cannot maintain an action against his own parents for lack of affection, for failure to provide a pleasant home, for disrupting the family life or for being responsible for a divorce which has broken up the home. An illegitimate child cannot be given rights superior to those of a legitimate child, and the plaintiff has no cause of action on this account.

But it would be pure fiction to say that the plaintiff suffers no injury. The lot of a child born out of wedlock, who is not adopted or legitimatized, is a hard one. The community itself has come to understand this hardship. After centuries of stagnation, an evolution has been taking place and illegitimate children are now being treated with more consideration. The contrast between the common law and present day statutes is striking.

Under the common law an illegitimate child was called "filius nullius" son of no one, or "filius populi" son of the people. People v. Moczek, 407 Ill 373, 95 NE2d 428; Cooley, 1 Blackstone's Commentaries, 455–459, 4th ed. His position in the community was one of ignominy and he had no rights in law. Since he was the child of no one he was without a

255

name; his parents had no right to his custody and no subsequent act of theirs could make him legitimate, only a special act of Parliament could do so. Robinson v. Ruprecht, 191 Ill 424, 61 NE 631; Pfeiffer v. Wright, 41 F2d 464; 73 ALR 932; Schouler, Domestic Relations, secs 698–701, 6th ed, 1920. He could not compel his parents to support him, he could not inherit and he could have no heirs except his widow and the issue of his own body. Vetten v. Wallace, 39 Ill App 390; Murrell v. Industrial Commission, 291 Ill 334, 126 NE 189.

In most American jurisdictions illegitimate children were also treated harshly, but in recent years a more compassionate sense of social justice has brought about the enactment of beneficent legislation which has alleviated some of the oppression long visited upon these unfortunates. The whole climate has changed nationally, with variations in degree from state to state. 26 Brooklyn L Rev 45 (1959); 38 Boston UL Rev 299 (1958); 15 Fordham L Rev 282 (1946). More euphonious terms are also being used in the statutes. "Bastard" is giving way to "illegitimate child," to "a child born out of wedlock," and to "a natural child"; "Bastardy Acts" have yielded to "Family Acts" and "Paternity Acts."

██ This liberalization is reflected in the statutes of Illinois: an illegitimate child has the right to his father's surname; either or both of his parents may be compelled to support and educate him until he becomes 18 years of age; his parents have custodial rights; he may be legitimatized by the marriage of his parents; if a birth certificate has been issued a new one is issued in the same form as for a legitimate child and the old certificate is impounded; if he is born following an attempted marriage, where some form of a lawful marriage ceremony has been performed, he is considered legitimate; if he is born of

256

an adulterous relation he may be legitimatized if his parents intermarry and his father acknowledges him to be his child; in order to facilitate his legitimation, the certificate of negative finding as to venereal disease in his parents, a prerequisite to marriage, is waived; he is not considered as illegitimate if, after his conception or birth, the marriage of his parents is declared void; the consent of his father is not necessary for his adoption; the word "illegitimate" and the phrase "born out of wedlock" cannot be used in his adoption petition or decree; he may inherit from his mother and his maternal ancestors; if his mother has died he may inherit from those from whom she might have inherited; his issue may take what he would have taken if he were living; not only his wife and descendants inherit from him, but his mother and her descendants can also.

The developing concern in Illinois for illegitimate children is also illustrated by the support provisions of the 1957 Paternity Act. (Ill Rev Stats 1957, c 106¾.) Since 1827 putative fathers have been obliged to contribute to the support of their children, but from 1827 to 1919 the maximum obligation imposed by law was $550; from 1919 until 1957 the statutory maximum was $1,100. This single amount was "held applicable whether the mother gave birth to one child, twins, triplets or quadruplets." Feirich, "The Paternity Act of 1957," 47 Ill BJ 824 (1959); Connelly v. People ex rel. Lewis, 81 Ill 379. Under the 1957 Act there is no limitation; the purpose of the Act is to see that the same care is provided for illegitimate as for legitimate children.

All these measures spring from the conscience of man disturbed by the severity of the common law and the patent injustices long suffered by innocent children, damned by the sins of their parents. By these benign statutes an illegitimate child's material

257

inequality has been lessened, his legitimation made easier and his succession rights improved. Praiseworthy as they are, they do not, and no law can, make these children whole. Children born illegitimate have suffered an injury. If legitimation does not take place, the injury is continuous. If legitimation cannot take place, the injury is irreparable.

The injury is not as tangible as a physical defect but it is as real. This is acknowledged by the State itself. The statutory provisions that a child's illegitimacy must be suppressed, in certain public records, is an admission of the hardship that can be caused by its disclosure. How often during his life does an illegitimate try to conceal his parentage and how often does he wince in shame when it is revealed? Public opinion may bring about more laws ameliorating further his legal status, but laws cannot temper the cruelty of those who hurl the epithet "bastard" nor ease the bitterness in him who hears it, knowing it to be true. This, however, is but one phase, one manifestation of the basic injury, which is in being born and remaining an illegitimate. An illegitimate's very birth places him under a disability.

It is of this that the plaintiff complains. His adulterine birth has placed him under a permanent disability. He protests not only the act which caused him to be born but birth itself. Love of life being what it is, one may conjecture whether, if he were older, he would feel the same way. As he grows from infancy to maturity the natural instinct to preserve life may cause him to cherish his existence as much as, through his next friend, he now deplores it. Be that as it may, the quintessence of his complaint is that he was born and that he is. Herein lies the intrinsic difficulty of this case, a difficulty which gives rise to this question: are there overriding legal, social, judicial or other considerations which should preclude recognition of a cause of action?

258

██ ██ Bearing in mind that an action for damages is implicit in any wrong that is called a tort (Prosser, Law of Torts, 2d ed, § 1, pp 2–4) it may be inconsistent to say, as we do, that the plaintiff has been injured by a tortious act and then to question, as we do, his right to maintain an action to recover for this act. This is done deliberately, however, because on the one hand, we believe that the elements of a willful tort are presented by the allegations of the complaint and, on the other hand, we approach with restraint the creation, by judicial sanction, of the new action required by the complaint.

██ Recognition of the plaintiff's claim means creation of a new tort: a cause of action for wrongful life. The legal implications of such a tort are vast, the social impact could be staggering. If the new litigation were confined just to illegitimates it would be formidable. In 1960 there were 224,330 illegitimate births in the United States, 14,262 in Illinois and 10,182 in Chicago. Vital Statistics of the United States 1960, Vol 1, §§ 1, 2 (1962). Not only are there more such births year after year (in Illinois and in Chicago the number in 1960 was twice that of 1950) but the ratio between illegitimate and legitimate births is increasing. This increase is attested by a report of the Illinois Department of Public Health, released in July, 1962. This report revealed that in Chicago in 1961, of the 87,989 live births 11,021 were illegitimate, a ratio of eight to one. In 1951 out of 81,801 births, 5,212 were illegitimate, a ratio of fifteen to one. The present Chicago ratio is twice that of the State and more than three times that of the Nation. The number of children who remain illegitimate is also of importance in estimating possible litigation. Accurate figures are not available, but a report made in October 1962 by the Illinois Public Aid Commission disclosed that in Cook County as of December 1961 there were 54,984 illegitimate children participating in the Aid to De-

pendent Children program. How many of these were born under circumstances making legitimation impossible, the report does not reveal.

█ That the doors of litigation would be opened wider might make us proceed cautiously in approving a new action, but it would not deter us. The plaintiff's claim cannot be rejected because there may be others of equal merit. It is not the suits of illegitimates which give us concern, great in numbers as these may be. What does disturb us is the nature of the new action and the related suits which would be encouraged. Encouragement would extend to all others born into the world under conditions they might regard as adverse. One might seek damages for being born of a certain color, another because of race; one for being born with a hereditary disease, another for inheriting unfortunate family characteristics; one for being born into a large and destitute family, another because a parent has an unsavory reputation.

The present case could be just a forerunner of those which may confront the courts in the future. Without stimulating them, we may have suits for wrongful life just as we now have for wrongful death. Cases are appearing in the domestic relations field concerning children born as a result of artificial insemination. Walker, Legitimacy and Paternity, 14 Ark L Rev 55 (1960). How long will it be before a child so produced sues in tort those responsible for its being?

Will there be public sperm banks such as the blood banks we now have? Presently, a private sperm bank is said to exist. The author of an article in the American Bar Association Journal wrote:

> ". . . to protect the issue of the astronauts from mutations resulting from ionizing radiation in space, a technique has been developed for them to deposit their sperm in a sperm bank and to preserve it indefinitely through a refrigeration

260

process. (See New York Times, July 16, 1961, p 57; August 29, 1961, p 26. 'Survival'—The American Institute of Biological Sciences Bulletin, October, 1961, p 15.)" Leach, Perpetuities in the Atomic Age: The Sperm Bank and the Fertile Decedent, ABAJ, vol 48, No 10 (1962).

If there are public sperm banks in future years and if there are sperm injections like present day blood transfusions, with donors and donees unknown to each other, will there not be a basis for an action for wrongful life?

As man's knowledge increases he will wield ever greater control over the functions of nature. Where this may lead and what its consequences may be are unpredictable. As one biologist observed, "Some would-be architects of our future look toward a time when it will be possible to alter the human germ plasma by design." Carson, Silent Spring, p 8 (1962). In the event it becomes possible to produce departures from normally-to-be-expected, inheritable qualities, would an action lie for wrongful life by a victim of intentional gene mutation who was dissatisfied with the result?

We shall include another example, farfetched to be sure, but illustrative of the point being discussed. Dr. George Wells Beadle, president of the University of Chicago and an eminent biologist, is quoted as saying, "No one has yet synthesized life, but biologists say it should be possible." Manly, University of Chicago, Chicago Daily Tribune, April 28, 1961. Under the title "Modern Creation" the medical editor of the same newspaper wrote this:

"What is the nature of life? To answer this question scientists first must create life in a test tube and research along this line is being done in many laboratories thruout the world. They are down

to the basic chemical ingredients and the code could be broken at any time by the right manipulation and recombining of different molecules." Van Dellen, Modern Creation, Chicago Tribune, January 20, 1963.

If such awesome experiments are successfully pursued and their ultimate goal, the abiogenesis of human life achieved, would a being so created have a cause of action for wrongful life against those whose knowledge and skill were so employed?

If we are to have a legal action for such a radical concept as wrongful life, it should come after thorough study of the consequences. This would be so even if the new action were to be restricted to illegitimates or even adulterine illegitimates. A study, of the depth and scope warranted by the gravity of this action, can best be made by the General Assembly which, as we have seen, has been steadily whittling away at the legal handicaps shackling bastards and has given them rights almost equivalent to those born legitimate. Changing economic, social or political conditions, or scientific advancements, produce new problems which are constantly thrust upon the courts. These problems often require the remolding of the law, the extension of old remedies or the creation of new and instant remedies—but no recent development is presented by this case which demands an immediate remedy to keep abreast of progress. Although the legal questions unfolded are new, the problem is not; the social conditions producing the problem have existed since the advent of man.

██ ██ We have decided to affirm the dismissal of the complaint. We do this, despite our designation of the wrong committed herein as a tort, because of our belief that lawmaking, while inherent in the judicial process, should not be indulged in where the result could be as sweeping as here. The interest of

society is so involved, the action needed to redress the tort could be so far-reaching, that the policy of the State should be declared by the representatives of the people.

Affirmed.

SCHWARTZ and McCORMICK, JJ., concur.