THELMA L. CESSNA, Plaintiff-Appellant, *v.* RAYMOND MONTGOMERY, Defendant-Appellee.

(No. 73-216; )

Fifth District—March 27, 1975.

*Rehearing denied June 26, 1975.*

888

EBERSPACHER, J., dissenting.

Robert L. Douglas, of Robinson, for appellant.

Samuel H. Taylor, of Lawrenceville, and John T. Phipps, of Champaign, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

This is an appeal by the plaintiff, Thelma Cessna, from a judgment

entered in the Circuit Court of Lawrence County dismissing a paternity action brought against the defendant, Raymond Montgomery.

The action was brought pursuant to section 4 of the Paternity Act (Ill. Rev. Stat. 1971, ch. 106¾, par. 54), to require the defendant to support Bridgett Mary Cessna, whom plaintiff alleges is the defendant's daughter. The plaintiff testified that Bridgett was born in July, 1970. Cherry Sikes, daughter of the plaintiff, testified that Bridgett was born on June 25 of either 1969 or 1970, and she thought it was 1969. However, this action which was not brought until March, 1973, was commenced at least 2 years and 8 months after Bridgett's birth. Section 4 of the Paternity Act (Ill. Rev. Stat. 1971, ch. 106¾, par. 54) provides in part that:

> "A proceeding to establish the paternity of a child born out of wedlock and to establish and enforce liability for its support, maintenance, education and welfare shall be instituted in the circuit court * * *. *No such action may be brought after the expiration of two years from the birth of the child.* However, where the person accused has acknowledged the paternity of the child by a written statement made under oath or affirmation or has acknowledged the paternity of such child in open court, prosecution may be brought at any time within 2 years from the last time such acknowledgment was made or within two years from the last time the person accused contributed to the support, maintenance, education and welfare of the child subsequent to such acknowledgment. *The time any person so accused is absent from the State shall not be computed.*" (Emphasis added.)

A motion to dismiss was made by defendant on the ground that the cause of action alleged in plaintiff's complaint did not occur within the time prescribed by the applicable statute. The motion to dismiss was sustained and judgment was entered for defendant.

■■ The issue of the constitutionality of section 4 was not presented in the trial court and was brought forward for the first time by the appellant on appeal. Because of public concern in this type of case and also due to the fact that the welfare, interests and protection of a minor child are of grave importance to society, we deem it necessary to consider appellant's position on the constitutionality of the statute involved. In *Hux v. Raben,* 38 Ill.2d 223, the supreme court stated:

> "A further word is appropriate, however, in view of the sweeping character of the attack on the judgment of the appellate court. The last sentence of Rule 341(e)(7) of the rules of this court (36 Ill.2d 138), 'Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing', states an admonition to the parties, not a limitation upon the juris-

diction of the reviewing court. The distinction clearly appears when that sentence is read in conjunction with Rule 366, which deals with the powers of a reviewing court and the scope of review. Rule 366 provides: '(a) *Powers.* In all appeals the reviewing court may, in its discretion, and on such terms as it deems just * * * (5) give any judgment and make any order that ought to have been given or made, * * *.' (36 Ill.2d 159.) A similar thought is expressed in the provision of Rule 615 with respect to the review of criminal cases: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 38 Ill.2d 223, 224.

Section 4, in one form or another, has been the law of Illinois since 1845. As set forth in section 8 of chapter 16, (Bastardy) of the Revised Statutes of Illinois (1845) (approved March 3, 1845):

"Sec. 8. No prosecution under this chapter shall be brought after two years from the birth of the bastard child: *Provided,* The time any person accused shall be absent from the State, shall not be computed."

A quick comparison of the underlined portions of section 4, quoted above, and its 1845 predecessor, reveals that both contain almost identical language with respect to the initial 2-year limitation period and the suspension of computation of time in the event that putative father is absent from the State. Such comparison—and a review of the legislative history of this statute—also reveals that certain exceptions to the initial 2-year limitation period (computed from birth of the illegitimate child) have been written into the statute over the years in order to soften the otherwise harsh literal application of the initial 2-year limitation period (computed from birth of the illegitimate child). Accordingly, formal acknowledgment by the person accused as the natural father (or his support contributions coupled with prior acknowledgment) "revives" an additional 2-year limitation period (potentially eight "revivals" or so) in which the paternity action can be brought.

Appellant sees section 4 as constituting "invidious discrimination" against illegitimate children in violation of the Fourteenth Amendment (*i.e.*, a denial of equal protection of law). One could just as forcefully argue that this statute constitutes "invidious discrimination" against women who are mothers of illegitimate children by throwing upon them the entire obligation to support their illegitimate children *after* the running of the 2-year period. Sex-based classifications are constitutionally suspect and must be examined carefully to determine:

1) whether the statutory classifications drawn are rationally re-

lated to a legitimate governmental objective (*Shapiro v. Thompson,* 394 U.S. 618, 658 (1969)); and

2) whether the statutory classification is overinclusive or underinclusive (that is, does the statute place additional burdens on some of those within the statutory classification, or does it allow some within the statutory classification to escape the burdens imposed by the statute) (see Note, *Are Sex-Based Classifications Constitutionally Suspect,* 66 Nw. U.L. Rev. 481 (1971)).

Under either the "rational basis" test or the "overinclusive or underinclusive" test, section 4 denies equal protection of law to the illegitimate child *and* to the mother of the illegitimate child.

■■ Clearly, the purpose of the 2-year limitation period of section 4 (regardless of whether it is conceptualized as limiting the right of action or bearing the remedy), is to protect a man from having to defend himself against a paternity action brought several years subsequent to the birth of the illegitimate child. The manifest intention of the legislature in enacting this statute was obviously to bar stale claims, to bring an end to litigation, to give impetus to the mother of the illegitimate child to bring the paternity action early (when the child was most in need of financial support). Such objectives are laudable, and were these objectives pursued in a statutory scheme which limited support actions against all natural fathers of legitimate as well as illegitimate children, there would be no question but that section 4 would be constitutional as being part of a rational classification to effect such purpose and intention and to achieve such objectives. However, section 4 is not part of any such statutory plan or scheme. It stands alone in Illinois law.

In Illinois, there is no time limitation on the right of the natural mother to require the natural father to support their minor child *born in wedlock.* Indeed, the duty of a natural father to support his "legitimate" minor child has been enforced (and retroactively applied) in a case in which the natural mother brought an inpersonam action against her ex-husband for support of their natural child, 15 years after her divorce decree had been entered. The divorce had been obtained by publication, not personal service, and the decree contained no order touching child support. (*Gill v. Gill,* 8 Ill.App.2d 625, *aff'd,* 56 Ill.2d 139.) In *Gill* the First District Appellate Court stated:

"*The duty of the father to support his minor child arises out of a natural relationship.* [Citation.] When the parents of a child are divorced and no provision is made in the decree relieving the father of his obligations, the father remains bound to provide

reasonable and proper support for the minor child, depending upon the age, ability and circumstances of the child." (8 Ill.App.3d 625, 628.) (Emphasis added.)

In *Dwyer v. Dwyer*, 366 Ill. 630, 10 N.E.2d 344, the Illinois Supreme Court held that the adoption of a child under the adoption act then in effect, which deprived the natural parents of all legal rights as respecting the minor child (*born in wedlock*) did not relieve the natural parents from all obligations to support the child. The Illinois Supreme Court stated:

"The duty of a parent to support his minor child *arises out of the natural relationship*." *Dwyer v. Dwyer*, 366 Ill. 630, 634. (Emphasis added.)

Since minor children born in wedlock are entitled to their natural fathers' support without time limitation during their minority, and since the duty of such natural fathers arises out of the natural relationship of father and child, *then* on what *basis* can illegitimate children be denied the right of their natural fathers' support two years subsequent (or more) from the dates of their birth? Since mothers of minor children born in wedlock can require the natural fathers to support such minor children without time limitation during their minority (indeed, criminal sanctions against the natural father can be envoked to effect such support), on what basis can mothers of minor children born out of wedlock be denied (2 years or more subsequent to the birth of the minor child) the right to require the natural fathers' support of such minor children? A minor child is a minor child; a natural father is a natural father; the minority of a child is the minority of a child. Natural fathers owe the duty of support to their legitimate as well as illegitimate children. Mothers of children born in wedlock are as mothers of children born out of wedlock; that is, both have the right to require the natural fathers to support their minor children. The only difference, therefore, between children born in wedlock and children born out of wedlock is the *legal* (not natural) concept of "legitimacy." The only difference between mothers of children born in wedlock and mothers of children born out of wedlock is also the concept of "legitimacy." Thus, the only *basis* for any distinction between the two otherwise identical groups of minor children and mothers of minor children *is* the fact of illegitimacy or legitimacy.

Without belaboring the obvious, it should be noted that the paternity action first seeks to determine (by accusation) the natural father. That such determination must first be made before imposing the judicially enforceable duty to support the minor child is merely the *consequence* (legal and practical) of illegitimacy, and is not itself the primary basis

of limiting the right of the illegitimate minor child to support by its natural father.

■■ The United States Supreme Court has held that there is no constitutionally sufficient justification for denying a judicially enforceable right on behalf of children to needed support from their fathers on the ground of illegitimacy; in *Gomez v. Perez*, 409 U.S. 535, 538, 35 L.Ed.2d 56, 60, 93 S.G. 872 (1973), the United States Supreme Court stated:

"Under these decisions [*Levy v. Louisiana*, 391 U.S. 68, and *Stanley v. Illinois*, 405 U.S. 654], a State may not invidiously discriminate against illegitimate children by denying them substantial benefits accorded children generally. We therefore hold that once a State posits a judicially enforceable right on behalf of children to needed support from their natural fathers there is no constitutionally sufficient justification for denying such an essential right to a child simply because its natural father has not married its mother. For a State to do so is, 'illogical and injust.' "

The United States Supreme Court was well aware of the potential problems the *Gomez* decision would have in the area of paternity actions. Nevertheless the Court held:

"We recognize the lurking problems with respect to proof of paternity. Those problems are not to be lightly brushed aside, *but neither can they be made into an impenetrable barrier that works to shield otherwise invidious discrimination.*" (Emphasis added). *Gomez v. Perez*, 409 U.S. 535, 538, 35 L.Ed.2d 56, 60, 93 S.Ct. 872 (1973).

If it is invidious discrimination against "bastards" to deny them substantial benefits accorded other children, then indeed it is invidious discrimination against women who are mothers of 'bastards' to limit to 2 years their right (unlike mothers of 'legitimate children') to seek or require that the natural fathers support such minor children.

The argument against holding section 4 unconstitutional rests on a desire to prohibit a situation in which a woman could wait 10 years or even 15 years from the date of birth, after determining which of her lovers might be able to provide the best support, and pick one out. Certainly this could be possible if there was no limitation on the woman's right to bring the action—yet, ever since 1845, this has been possible (not, of course, so probable) if the woman had several lovers who moved in and out of the State. The fear of perjury on the part of women bringing paternity actions is no less real, whether the action is or is not limited to 2 years as under the present statute.

It is instructive to note the language of Mr. Justice Douglas in *Harper*

894

*v. Virginia State Board of Elections,* 383 U.S. 663, 669, 16 L.Ed.2d 169, 174, 86 S.Ct. 1079 (1966):

> "* * * the Equal Protection Clause is not shackled to the political theory of a particular era. In determining what lines are unconstitutionally discriminatory, we have never been confined to historic notions of equality, any more than we have restricted due process to a fixed catalogue of what was at a given time deemed to be the limits of fundamental rights. [Citation.] Notions of what constitutes equal treatment for purposes of the Equal Protection Clause *do* change."

Likewise, the Equal Protection Clause is not shackled to social theories or sexual mores of a particular era. Times have changed since the ancestor of section 4 was enacted in 1845. Unlike the 1845 statute (the 1845 statute is contained in a chapter entitled "Bastardy"), we as a people are more tolerant and sympathetic of the child born out of wedlock—we call him illegitimate, not "bastard"; we reserve the word "bastard" for other uses (mostly defamatory or descriptive of contempt—and totally unrelated to minor children). The stigma attached to bastardy—for better or worse—has diminished substantially since 1845. A social policy which would treat illegitimate children as "unclean" or "untouchable" is unthinkable today. Such was not so in 1845.

Section 4, by limiting the right of action for support of the illegitimate child to two years subsequent to birth, protects the putative father by invidious discrimination against a class of children and their mothers. There is no rational relationship between illegitimacy (as a classification) and protecting a putative father two years after the birth of the illegitimate child—especially so since there are "revivals" of two-year periods in any event. Under the statutory classification, some illegitimate children will be denied support during their minority, others will not; under the statute, some illegitimate children denied their natural fathers' support because the two-year limitations has run will (by the statutory exceptions) later receive their natural fathers' support (others will not); under the statute, some mothers of illegitimate children will successfully require the natural fathers to support their minor children (either in the initial two-year period, or under the operation of an exception, at a later date); other mothers of illegitimate children will lose the right to require such support. Indeed, section 4 denies equal protection based upon arbitrary (irrational) classification which operates irrationally upon children born out of wedlock and their mothers.

The order of the circuit court allowing defendant's motion to dismiss is hereby reversed, and the cause is remanded to the Circuit Court of

Lawrence County for further proceedings consistent with the views expressed in this opinion.

G. MORAN, J., concurs.

Mr. JUSTICE EBERSPACHER, dissenting.

In view of the holdings in *City of Chicago v. Birnbaum*, 49 Ill.2d 250, 274 N.E.2d 22, and in *People v. Amerman*, 50 Ill.2d 196, 279 N.E.2d 353, both decided subsequent to *Hux v. Raben*, 38 Ill.2d 223, I do not consider *Hux v. Raben* as authority for this court reaching the constitutional questions raised; in this case, raised the first time in this court. I would therefore dismiss the appeal. In the court below the only argument that was made was that the complaint came within the exception created by acknowledgment, included in section 4 of the Paternity Act (Ill. Rev. Stat. 1971, ch. 106¾, par. 54). That argument was abandoned in this court, and here for the first time appellant contends, first, that the statute of limitations as set out in the statute is overly broad and as such is against public policy, and secondly, that such statute results in an invidious discrimination against a class (children born out of wedlock) and as such violates the *child's* fourteenth amendment rights to equal protection. The briefs do not contend invidious discrimination against unwed mothers, on which the majority seems to rely.

I do not agree that the public concern, or the matter is of such grave importance, that we should ignore the holdings of *City of Chicago v. Birnham and People v. Amerman*. If there is a social problem involved which cries out for reform, to provide different means of support for those born out of wedlock, or their mothers, than exists in our statutory scheme and Federal and State programs such as aid for dependent children, the appeal should be made to legislative bodies, rather than an intermediate appellate court to *volunteer* to take up the cause.

As was said in *Zepeda v. Zepeda*, 41 Ill.App.2d 240, 262-63, 190 N.E. 2d 849, 859:

> "* * * lawmaking, while inherent in the judicial process, should not be indulged in where the result could be as sweeping as here. The interest of society is so involved, the action needed to redress the tort could be so far-reaching, that the policy of the State should be declared by the representatives of the people."

It is interesting to note that in *Zepeda* there was a direct appeal to our Supreme Court, which refused to take the case and transferred it to the Appellate Court, despite the fact that constitutional issues were advanced on behalf of a child born out of wedlock in an action brought on the child's behalf against his admitted natural father for damages for de-

privation of the right to be a legitimate child and the incidents thereto.

Assuming that this court was to properly consider the constitutional arguments here advanced, I do not consider that the Illinois cases cited, nor the United States Supreme Court cases cited, compel the result which has been reached. See Annot., 38 A.L.R. 3d 613 *et seq.* (1971).