*In re* MARRIAGE OF DENNIS D. KENIK, Petitioner and Counterrespondent-Appellant, and IRENE T. KENIK, Respondent and Counterpetitioner-Appellee.

First District (2nd Division)   No. 1—88—0386

Opinion filed March 28, 1989.

Mammas & Goldberg, Ltd., and Grant & Grant, both of Chicago (Jerry S. Goldberg and Evan James Mammas, of counsel), for appellant.

Schiller, DuCanto & Fleck, Ltd., of Chicago (Charles J. Fleck and Sarane C. Siewerth, of counsel), for appellee.

JUSTICE HARTMAN delivered the opinion of the court:

Petitioner/counterrespondent, Dennis D. Kenik (Dennis), appeals from circuit court orders denying his motions to strike respondent/ counterpetitioner's, Irene T. Kenik's (Irene's), petition for bifurcated judgment of dissolution of marriage and to change venue, and granting a bifurcated judgment of dissolution of marriage. We are asked to determine whether: (1) this court lacks jurisdiction to review the circuit court's denial of Dennis' motions to change venue and to dismiss Irene's petition for a bifurcated judgment; (2) the circuit court erred in denying Dennis' motion to change venue, assuming we have jurisdiction; (3) the circuit court erred in finding proper grounds existed to enter a judgment of dissolution of marriage; (4) the circuit court erred in failing to follow its own procedures for the transfer and reassignment of cases; and (5) the circuit court abused its discretion in granting Irene's petition for a bifurcated judgment of dissolution of marriage.

On May 7, 1985, Dennis filed a petition to dissolve his 1978 marriage to Irene. The Keniks have one child, Scott, born in 1983. Irene filed a verified response and a verified counterpetition for dissolution of marriage on July 30, 1985, to which Dennis responded on February 13, 1986. On November 9, 1987, Irene petitioned for entry of a bifurcated judgment of dissolution of marriage, asserting that "appropriate circumstances" for bifurcation existed, as mandated by section 401(b) of the Illinois Marriage and Dissolution of Marriage Act (IMDMA) (Ill. Rev. Stat. 1987, ch. 40, par. 401(b)).

By order entered November 18, 1987, the circuit court judge assigned to the case recused himself and directed the case to the presiding judge for reassignment. On December 15, 1987, the present trial judge entered two orders. First, he assigned the case to himself. Second, he granted Dennis seven days to respond to the petition for bifurcation of judgment.

Dennis moved on December 21, 1987, to strike the petition for bifurcation of judgment for failure to state a cause of action and to withdraw his petition for dissolution of marriage. On December 29, 1987,

Dennis petitioned the court "for [s]ubstitution of [j]udges," insisting that he "[feared] *** he [would] not receive a fair and impartial hearing in the court in which this cause is now pending due to this [court] being prejudiced against him," and that he filed the petition prior to trial and before the "ruling on any substantive issue." Both the motion to dismiss and the motion to change venue were denied on December 31, 1987.

Following a hearing, the court granted a bifurcated judgment of dissolution on January 21, 1988, explicitly reserving "[a]ll other issues of child custody and visitation, property division and attorneys' fees." In its January 21 order, the court found an irretrievable breakdown of the marriage due to irreconcilable differences between the parties and that appropriate circumstances existed for the entry of a bifurcated judgment, namely: (1) "[Irene] has learned she is presently pregnant by her fiancee [sic] whom she earnestly wishes to marry as soon as possible"; and (2) "[I]nsurance coverage for birth and all other maternity expenses can be had under the medical insurance coverage held by [Irene's] fiancee [sic]; however, if [Irene] and her fiancee [sic] are not married at the time of the birth, none of said expenses will be covered, with the resulting imposition of large medical bills on [Irene]." The court further determined that "[t]he likelihood that any *** equities [sic] and complications *** will result in this case is very remote." Dennis appeals.

I

Dennis asserts first that the circuit court erred in failing to grant his motion to change venue. Prior to the filing of his motion, Dennis contends, the court ruled only on his request to file a response to Irene's petition for bifurcation of judgment, and therefore, entered no substantive rulings precluding a substitution of judges.

Irene counters that this court lacks jurisdiction to entertain an appeal of the December 31 order, denying Dennis' motions to change venue and to dismiss the petition for a bifurcated judgment. Citing *In re Marriage of Bogan* (1986), 116 Ill. 2d 72, 76, 506 N.E.2d 1243, Irene correctly observes that the appellate court may review an appeal from an entry of a bifurcated judgment of dissolution but may determine only the propriety of the bifurcation itself; all other issues ancillary to the dissolution claim must be disposed of by the lower court before any are susceptible to appeal. (See *In re Marriage of Leopando* (1983), 96 Ill. 2d 114, 119, 449 N.E.2d 137.) The statement in the December 31 ruling that "there is no just reason to delay appeal or enforcement of this order" does not necessarily invest this court with

jurisdiction to review an otherwise nonappealable order. *In re Marriage of Koch* (1983), 119 Ill. App. 3d 388, 389, 456 N.E.2d 644.

■ Assuming, *arguendo*, that the appeal is properly here, Dennis' argument also fails on the merits. The right to a change of venue is absolute where a party alleging prejudice of the presiding judge moves to transfer venue before a trial or hearing commences and before the judge to whom the motion is presented enters a substantial ruling. *In re Marriage of Birt* (1987), 157 Ill. App. 3d 363, 366, 510 N.E.2d 559; Ill. Rev. Stat. 1987, ch. 110, par. 2—1001(c).

The record evidence in the case at bar demonstrates that the trial judge entered a protective order on October 27, 1987, which reserved for a later date a ruling on temporary custody of Scott and ordered that Dennis have access to Scott from 4 p.m. on October 30, 1987, to 7 p.m. on November 1, 1987. Dennis' request for joint custody in his petition for dissolution and Irene's request for sole custody in her response, as well as Dennis' October 27, 1987, petition for temporary custody, illustrate that the protective order addressed substantial issues contested by the parties.

■ When attorneys for Irene and Dennis appeared before the court on December 15, 1987, moreover, each engaged in argument concerning the existence of appropriate circumstances to bifurcate judgment of dissolution. Irene's attorney enumerated factors supporting her petition for bifurcation, including: her pregnancy; Dennis initiated the divorce proceedings; public policy encourages the legitimization of children; the parties filed no joint tax returns for the two preceding years; and lack of medical insurance for Irene or the unborn child. Dennis' attorney objected to bifurcation and challenged Irene's representations regarding the legitimacy of children born in wedlock, but not to their natural mother and father. This exchange presented Dennis the opportunity to form an opinion as to the court's reaction to his claim, thereby additionally foreclosing Dennis' automatic right to a change of venue. (See *In re Marriage of Kozloff* (1984), 101 Ill. 2d 526, 530-31, 463 N.E.2d 719; *In re Marriage of Birt*, 157 Ill. App. 3d at 366.) The entry of the order denying Dennis' motion was not in error.

## II

Dennis next assigns error to the circuit court's failure to follow its own rules and general orders pertaining to assignment of cases. Dennis argues that pursuant to the November 18, 1987, order recusing the first assigned judge from the case and returning it to the presiding judge of the domestic relations division, "random electronic assignment to a new calendar, excluding the calendar letter of any judge to

whom the cause has been assigned, was required," citing Cook County Circuit Court Rule 13.8 (Cook County Circuit Court R. 13.8 (as amended July 1, 1988)) and Cook County Circuit Court General Order 15.3 (Cook County Circuit Court General Order 15.3 (as amended July 1, 1988)). Instead, the trial judge assigned the case to himself on December 15, 1987.

■ Irene insists Dennis waived this issue, by failing to object to the circuit court's actions on December 15 (*McElroy v. Force* (1967), 38 Ill. 2d 528, 535, 232 N.E.2d 708); however, Dennis registered timely objections before the court on December 29, 1987, thus preserving the issue for appeal.

■ Irene additionally observes that Dennis neither argues nor demonstrates what prejudice, if any, adhered to his claim by the court's contravention of its own procedure. The mere failure of the court to follow an order to receive all matters from an assignment judge does not require automatic reversal of a dissolution judgment or order of legal separation. (See *Kocis v. Kocis* (1964), 47 Ill. App. 2d 68, 73, 197 N.E.2d 460; *Payne v. Payne* (1961), 31 Ill. App. 2d 141, 150, 175 N.E.2d 614.) A successful claim of reversible error must be supported by evidence of actual prejudice to appellant's claim. *Svenson v. Miller Builders, Inc.* (1979), 74 Ill. App. 3d 75, 86, 392 N.E.2d 628.

■ Decisions Dennis offers as authority do not persuade. In each, the alleged error arises from a failure to follow notice provisions contained in court rules. (See *Feldott v. Featherstone* (1919), 290 Ill. 485, 488, 125 N.E. 361; *North Avenue Building & Loan Association v. Huber* (1918), 286 Ill. 375, 383, 121 N.E. 721; *Swiercz v. Nalepka* (1930), 259 Ill. App. 262, 265.) Each decision also makes plain the materiality of the alleged error to the outcome of the case. Here, Dennis never suggested how the court's actions might have prejudiced his claim. We find no reversible errors in assignment by the judge of the case to himself.

### III

Did the circuit court err in granting the judgment of dissolution where, admittedly, the parties physically did not live "separate and apart" continuously for two years as required by section 401(a)(2) of the IMDMA? (Ill. Rev. Stat. 1987, ch. 40, par. 401(a)(2).) There was uncontradicted testimony at the January 21, 1988, hearing that Dennis and Irene resided in the same house until August or September of 1986.

■ Illinois courts have yet to construe "separate and apart" within the context of section 401(a)(2). Susceptibility of the phrase to

discordant readings justifies consideration of extrinsic evidence to resolve its meaning. *Spinelli v. Immanuel Evangelical Lutheran Congregation, Inc.* (1986), 144 Ill. App. 3d 325, 330, 494 N.E.2d 196.

Legislative debates surrounding the statute's enactment clearly reveal its sponsors intended an expansive reading of the provision. State Senator William A. Marovitz declared that a court could exercise its discretion in determining whether parties exist "separate and apart":

> "If the judge determines that living separate and apart they have to be living in separate households, so be it. If the judge determines that living *** apart *** they can be living under the same roof but there is [*sic*] no conjugal visits, they *** are living in separate bedrooms, they are doing *** their own laundry, their own meals, whatever, that's up to the judge and that's *** what the case law is today." (83d Ill. Gen. Assem., Senate Proceedings, November 3, 1983, at 60).

This interpretation finds support in *In re Marriage of Uhls* (Mo. App. 1977), 549 S.W.2d 107, where the court, construing a no-fault divorce provision similar to the Illinois statute, held "separate and apart" to mean "separate lives" as opposed to "separate roofs." (*In re Marriage of Uhls*, 549 S.W.2d at 112.) The *Uhls* court found the parties lived "separate and apart" for several years, although they shared the same home, because they ceased marital relations four years before filing the petition for divorce, maintained separate bedrooms and ate meals at different times. The parties also took separate vacations, did their laundry in different washing machines and avoided "[a]ll conversation or other communication." *In re Marriage of Uhls*, 549 S.W.2d at 112.

Testimony adduced in the case *sub judice* revealed Dennis and Irene not only ended all marital relations a year before Dennis filed his petition for dissolution of marriage, but also that they used separate bedrooms and had "no meaningful communication" with each other. Irene swore as well that she exhausted her credit union account to meet household expenses, to which Dennis contributed nothing. Though Dennis responds he donated whatever he was "able to give," the record demonstrates that the circuit court entered an order in February 1986, pursuant to Irene's petition for temporary support and maintenance, establishing a detailed schedule of financial obligations for each party. Dennis was ordered to pay "one-half of all average monthly expenses of the parties and minor child (except for food and telephone)," and for Scott's food when caring for him. Dennis could receive incoming calls on the home telephone, but was forbidden to make outgoing calls. Each party, further, was responsible for individual

personal expenses such as "clothing, grooming, medical, \*\*\* work \*\*\* commuting, social obligations, vacations and automobile."[1]

Dennis mistakenly relies on *Smith v. Aaron, Aaron, Schimberg & Hess* (1983), 112 Ill. App. 3d 653, 655, 445 N.E.2d 67, and *In re Marriage of Eltrevoog* (1982), 92 Ill. 2d 66, 69, 440 N.E.2d 840, where the courts were called upon to interpret the phrase "separate abode" in the pre-1982 section 402 of the IMDMA (Ill. Rev. Stat. 1981, ch. 40, par. 402). As noted in *Rich v. Rich* (1975), 24 Ill. App. 3d 1083, 1085-86, 321 N.E.2d 480, furthermore, "separate and apart" must be construed in the context in which it is used: if the theory animating the dissolution claim is, for instance, desertion, physical separation of the parties is an inherent element of the cause of action. Under the no-fault provisions of section 401(a)(2), dissolution is predicated upon a finding of "irretrievable breakdown" of the marriage due to "irreconcilable differences." (Ill. Rev. Stat. 1987, ch. 40, par. 401(a)(2).) In our opinion, this is a state which can be realized without physical distance between the parties.

█ Equally unavailing to Dennis' claim are cases he cites from foreign jurisdictions. In *Pangallo v. Pangallo* (1984), 329 Pa. Super. 25, 477 A.2d 885, the parties occupied the same farm compound but were rarely in their marital residence simultaneously, and the court expressly reserved for "another day" the question of whether persons occupying the same home live "separate and apart." (*Pangallo v. Pangallo*, 477 A.2d at 888 & n.4.) The court in *Wife v. Husband* (Del. Super. 1968), 238 A.2d 606, 607, denied the possibility that nonconjugal cohabitants of a single house lived "separate and apart"; however, the petitioner sought a divorce on the grounds of "voluntary separation," which, under the reasoning of *Rich v. Rich*, could not be achieved while the parties occupied the same dwelling.

No error arose from the finding in the present case that the parties lived "separate and apart."

IV

Dennis lastly contends it was an abuse of the circuit court's discretion to enter a bifurcated judgment of dissolution where "appropriate

---

[1]Dennis' May 1985 verified petition for dissolution, which contends the parties "lived separate and apart for a continuous period of not less than six months" and ceased cohabitation in August 1984, explicitly supports the finding urged by Irene. Dennis moved to withdraw the petition on December 21, 1987; no order disposing of the motion appears of record, however, and Dennis is therefore bound by factual allegations set forth in the petition. *Zannis v. Lake Shore Radiologists, Ltd.* (1979), 73 Ill. App. 3d 901, 905, 392 N.E.2d 126.

circumstances" to enter the judgment did not exist.

Illinois law encourages resolution of all issues ancillary to dissolution, as well as dissolution itself, in a single proceeding, for reasons of certainty, financial security (*In re Marriage of Cohn* (1982), 93 Ill. 2d 190, 198-99, 443 N.E.2d 541; *In re Marriage of Britton* (1986), 141 Ill. App. 3d 588, 591, 490 N.E.2d 1079), and judicial economy. (*In re Marriage of Leopando*, 96 Ill. 2d at 120.) Upon a finding of "appropriate circumstances," however, section 401(b) of the IMDMA allows a court to enter a judgment of dissolution while reserving for later determination such issues as maintenance, child support, and property disposition. (Ill. Rev. Stat. 1987, ch. 40, par. 401(b).) No attempt has been made to compile an exhaustive list of facts justifying a bifurcated judgment (*In re Marriage of Bogan*, 116 Ill. 2d at 80; *In re Marriage of Cohn*, 93 Ill. 2d at 199), but the supreme court has identified the following "appropriate circumstances": the court lacks personal jurisdiction over the respondent; a party is unable to pay child support or maintenance if so ordered; the court has created an adequate fund for child support pursuant to section 503(g) of the IMDMA (Ill. Rev. Stat. 1987, ch. 40, par. 503(g)); the parties' offspring do not reside with either parent (*In re Marriage of Cohn*, 93 Ill. 2d at 199); or any other reason of "the same caliber" (*In re Marriage of Bogan*, 116 Ill. 2d at 80).

At bar, James McPartlan (McPartlan) testified that he and Irene met in March 1986, he commenced sexual relations with her in January 1987 and, in April 1987, he began living with her, together with Irene's son, Scott. McPartlan testified to the following material facts: (1) he and Irene plan to marry as soon as she obtains a divorce; (2) he is the father of Irene's unborn child; (3) he intentionally impregnated Irene; and (4) no other males have been involved with Irene sexually or romantically during the pendency of her divorce. He possessed no medical evidence that he is the father of Irene's child. McPartlan owns medical insurance which provides coverage for his dependents, including his children.

Irene testified that she met McPartlan in March 1986. She had no sexual relations with men in 1987 other than McPartlan, was pregnant, and was due to give birth on February 24, 1988. She described the marital estate shared with Dennis as follows: (1) approximately $12,000 to $13,000 in proceeds from the sale of the marital residence in August 1986, held in an escrow account; (2) Dennis' pension fund; (3) a diamond given to Irene as a gift; (4) diamond earrings; (5) a diamond engagement ring; and (6) Irene's TWA credit union account. Regarding the last item, Irene insisted the account contained approximately

$50,000 in 1984 and that, beginning in the summer of 1984, the funds were "dissolved over several years, using it to live on and other necessities, vacations and \*\*\* so forth," because Dennis contributed no money for mortgage payments or payments for utilities, food or clothing from summer 1984 until they separated in August 1986. She denied that Dennis failed to contribute to household expenses for only a few months in 1985 and that he turned his unemployment compensation over to her. Irene admitted prior deposition testimony that she gave the $50,000 to Dennis to invest for her was untrue; she swore she lied because she was "scared" and "had no other financial backing."

Irene averred that in 1975 she acquired a one-quarter, beneficial interest in a building in Elmwood Park, Illinois. She directed that interest to one of her brothers in 1984 or 1985, prior to the filing of Dennis' divorce petition, as compensation for care rendered by her brother for her invalid father. She received no remuneration for the transfer. Irene never had her interest in the property appraised, although she knew the building was later sold for $300,000.

Irene maintained she filed tax returns independent of Dennis in 1986 and 1987, is currently unemployed, last worked in July 1987 as a part-time waitress, lived with her brother from September 1986 until April 1987, and is currently covered by Dennis' medical insurance. She is aware that Dennis possesses a pension and an IRA account, and that the pension continues to grow each year. She is also cognizant that, if the court enters a bifurcated judgment, she has no claim to any increase in the pension's value. Irene denied entry of any court order directing her to comply with the February 1986 order requiring each party to pay one-half of the household expenses.

Dennis insisted Irene's statement that he failed to contribute to household expenses was untrue. The company he worked for in 1985 went bankrupt and he was not always able to pay one-half of the household costs, yet he contributed what he was "able to give." Approximately one month elapsed between the time Dennis was laid-off in 1985 and the time he found a new full time job. He now is employed as a truck driver.

Dennis swore he made support payments in 1985 and paid some family bills that year, and could not remember January 30, 1986, deposition statements that he hadn't paid any household expenses for "over a year" or that money he earned "from working out of the union" went to his "self-expenses." When he was out of work in 1985, he cared for his son three to four days per week while his wife worked as a flight attendant, payment for both his and his son's expenses during those days.

He acknowledged possession of a pension and an IRA account and that he owns group medical insurance which covers his "wife and children." To maintain the insurance, he must pay $10 to $11 per day any day he does not work. Should Irene give birth to her child prior to the dissolution of their marriage, Dennis said, he would be "financially responsible" and he believed the insurance company providing his coverage similarly would be "responsible" because he and Irene are still married. When asked if he would consider the child his own, Dennis responded, "I'll look upon any child as a child. The child is to be loved." He further "[believes] that we as adults are all responsible for children." Dennis would pay child support "if they can't handle it."

Irene admits the testimony related above establishes none of the four factors enumerated in *In re Marriage of Cohn* (93 Ill. 2d 190) as "appropriate circumstances" for a bifurcated judgment; nevertheless, she cites *Zepeda v. Zepeda* (1963), 41 Ill. App. 2d 240, 255-58, 190 N.E.2d 849, and the Illinois Parentage Act of 1984 (Ill. Rev. Stat. 1987, ch. 40, par. 2501 *et seq.*) as evidence of this State's interest in having its residents recognized as legitimate at birth. Irene's speedy marriage to McPartlan should therefore be encouraged so that their child may be born legitimate, she contends. This argument ignores the presumption of legitimacy attaching to any child born in wedlock. (*People ex rel. Valle v. Valle* (1983), 113 Ill. App. 3d 682, 686, 447 N.E.2d 945.) A child born to unwed parents, moreover, is legitimized by their subsequent marriage. Ill. Rev. Stat. 1987, ch. 40, par. 303.

Irene persuasively argues, however, that the reasons advanced by the *Cohn* court to discourage bifurcated judgments do not exist here, *i.e.*, (1) the court may be required to adjudicate marital property rights that have become entangled with the supervening rights of third parties, including subsequent spouses; (2) dissolving the marriage prior to property disposition would complicate matters with respect to the rights of a surviving spouse in the event of an intervening death; and (3) the loss of: (a) the ability to file joint income tax returns; (b) medical insurance coverage; and (c) marital property treatment for property accumulated during the intervening period between the entry of the judgment of dissolution and the final disposition of property rights. *In re Marriage of Cohn*, 93 Ill. 2d at 198-99.

In this case, the marital property consists of the proceeds of the sale of the marital residence held in escrow, certain jewelry, Dennis' pension, an IRA account, and Irene's credit union account, items all readily identifiable and easily divided between the parties. Irene's uncontested testimony demonstrated she relinquished her interest in the Elmwood Park property prior to the filing by Dennis of his petition to

dissolve the marriage. In 1988, Irene was 36 and Dennis 49, and both apparently in good health, rendering unlikely complications arising from the "intervening death" of either spouse. The parties, moreover, ceased filing joint tax returns in 1986, and the relative meagerness of the parties' finances made further acquisition of marital property highly improbable. Irene would almost certainly benefit from Dennis' medical insurance as long as she remained married to him; however, Dennis acknowledged he was not sure if a child not his own could similarly share in that coverage.

Evidence adduced at bar illumines as well the precarious position in which the baby would be placed if Dennis remained responsible for its welfare. Dennis expressed little genuine interest in caring for the child and instead described his obligation in purely "societal" terms. Furthermore, his erratic contributions to household expenses prior to the parties' separation necessitated, in February 1986, a court order to ensure he paid one-half of the family's most fundamental financial obligations. In contrast, McPartlan expressed eagerness to marry Irene and unequivocally acknowledged the child as his own. Once married to McPartlan, Irene and the baby would enjoy insurance protection as McPartlan's dependents.

■■ Finally, we note that Dennis' objections to bifurcation manifested themselves late in the litigation chronology. Dennis initiated the dissolution proceedings and did so with an apparent eagerness to terminate the marriage: he stated in his verified petition his "[belief] that the requirement of living separate and apart shall be waived by both parties in accordance with the statute." Indeed, the transcript of a hearing conducted December 15, 1987, illustrates that, until that date, Dennis had led Irene to believe that the hearing would be a "prove-up" only and that the parties would that day conclude the dissolution of the marriage.

The relative absence of "complications" and "entanglements" arising from the bifurcation of this particular judgment, combined with the exigencies created by Irene's pregnancy, raise these circumstances to the "same caliber" of those cited in *In re Marriage of Cohn* (93 Ill. 2d 190). The court did not abuse its discretion in bifurcating the judgment of dissolution of marriage.

For the reasons above-stated, we affirm.

Affirmed.

EGAN, P.J., and SCARIANO, J., concur.