# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*In re Marriage of Hluska*, 2011 IL App (1st) 092636

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF REBECCA HLUSKA, Petitioner-Appellee, and MIKE HLUSKA, Respondent-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-09-2636 |
| Filed | December 9, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In marriage dissolution proceedings, the trial court did not err in apportioning marital assets, awarding maintenance and awarding attorney fees to petitioner without first valuing certain marital and nonmarital assets, in reserving the allocation of petitioner's credit card obligations, and in classifying respondent's ownership interests in two corporations as marital assets. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-D6-30760; the Hon. Timothy P. Murphy, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Mikal J. Stole, of Reich, Jumbeck & Associates, LLP, of Joliet, for appellant. |
|---|---|
| | Charles E. Antonietti and Fred M. McDonald, both of Antonietti & Associates, of Calumet City, for appellee. |
| Panel | PRESIDING JUSTICE R. GORDON delivered the judgment of the court, with opinion. |
| | Justices Garcia and Lampkin concurred in the judgment. |

**OPINION**

¶ 1        Respondent Mike Hluska[1], age 57, appeals certain provisions in a judgment for dissolution of his marriage to petitioner, Rebecca Hluska, age 54. On appeal, respondent claims that the trial court erred in: (1) apportioning marital assets, awarding maintenance, and awarding attorney fees to Rebecca without first valuing certain marital and nonmarital assets; (2) reserving allocation of Rebecca's credit card obligations; and (3) classifying his ownership interests in two corporations as marital assets. For the reasons set forth below, we affirm.

¶ 2                                          I. BACKGROUND

¶ 3        On July 6, 2005, Rebecca filed a petition for dissolution of marriage alleging that she and Mike were married on June 4, 1983, in Cook County, Illinois. The parties had two children from their marriage who were emancipated and attending local colleges at the time of the dissolution. No issues are raised in Rebecca's petition for dissolution, or Mike's appellate brief, concerning child support, custody, visitation or contributions toward college expenses.

¶ 4        In her petition, Rebecca alleges that she and Mike had been living separately since 2001 and that irreconcilable differences have caused an irretrievable breakdown of the marriage. She petitioned for the entry of a judgment dissolving the parties' marriage, asking the trial court to award her maintenance and attorney fees, to assign to her the nonmarital property that belonged to her, and to award her a fair and equitable proportion of the martial property.

¶ 5                                      A. Procedural History

¶ 6        On September 19, 2005, Rebecca propounded written discovery requests to Mike and

_____

[1]In the briefs and record, the appellant's name is stated as both "Mike" and "Michael." For simplicity's sake, we will refer to the appellant as "Mike," as stated in the caption of this appeal.

subpoenaed Mike's employer, Hluska Enterprises, Inc. (Hluska), for financial information, including the value of Mike's ownership interest in Hluska and any other ownership interests of which Hluska was aware. The discovery requests are not included in the record on appeal.

¶ 7      On August 18, 2006, Rebecca filed a petition for temporary maintenance, alleging she was terminated from her employment as a marketing representative and is in need of support. On October 19, 2006, the trial court ordered Mike to pay $500 per month to Rebecca. Although no petition requesting an increase to Rebecca's temporary maintenance amount is included in the record on appeal, on December 6, 2006, the trial court increased the temporary maintenance payments to $750 per month in an order setting the matter for trial on March 19, 2007.

¶ 8      On January 24, 2007, Rebecca filed a motion to compel discovery, claiming that she served Mike with written discovery requests on September 20, 2005, but that Mike failed to respond to those requests. On February 6, 2007, the trial court ordered Mike to comply with the written discovery requests within 21 days.

¶ 9      On February 28, 2007, Rebecca filed a motion to continue the scheduled trial set for March 19, 2007, because Mike had not responded to the written discovery and his employer, Hluska, had not responded to a subpoena. The trial court continued the trial to December 10, 2007.

¶ 10      On March 23, 2007, Rebecca filed a motion for discovery sanctions. On April 5, 2007, before the trial court ruled on Rebecca's motion, Mike answered Rebecca's written interrogatories. In his answers, Mike stated that, since 2000, he has been employed as a manager with Hluska and its sister corporation, Good Times Gifts, Gags and Fireworks, Inc. (hereinafter, Good Times). Hluska, a subchapter S corporation, and Good Times, a subchapter C corporation, are both incorporated in the State of Indiana. Hluska operates seasonal attractions, which includes a "haunted house" called "Reaper's Realm." Hluska also operates a year-round retail fireworks store in Indiana. Good Times appears to sell fireworks in Indiana, although the record is not clear concerning its business operations. Mike stated that his net income is $1,000 per week and his employment is divided between the two companies "depending upon the time of the year." Mike further stated that he held an interest in both corporations, but did not state the percentage amount of that interest.

¶ 11      In September 2007, Hluska and Good Times filed a "Joint Motion to Quash Subpoenas *Duces Tecum*." The exact date as to when the joint motion was filed is not clear because a copy is not included in the record on appeal. However, a copy of Hluska and Good Times' joint reply is included in the record, which was filed on December 6, 2007. In the joint reply, the corporations argue: (1) that, as Indiana corporations, which conduct no business in Illinois, they cannot be compelled to comply with Rebecca's subpoenas; and (2) that Mike's ownership interests in Hluska and Good Times were acquired by gift and, thus, should be considered nonmarital property.

¶ 12      Attached to the joint motion was an affidavit from Mike's brother, John Hluska, who is president of Hluska and Good Times. John stated that in 1992, he "voluntarily and gratuitously transferred a portion of [his] equity interest in Hluska (representing 7.5% of the total shares of the company) to Mike, with the intent that such transfer be made absolutely

and irrevocable as a gift to him." He also stated that in 1995, their mother, Katheryn, transferred a portion of her interest in Hluska to Mike as a gift. John stated that Mike then held an 11.75% "minority interest" in Hluska. John further stated that in 1995, Good Times was incorporated as a sister corporation to Hluska and that all the initial costs and expenses "were paid for and contributed by Hluska and that Mike received an equal share in the corporation representing 25% of the total shares."

¶ 13 On October 31, 2007, Rebecca filed her second motion to continue a scheduled trial date. The trial court granted the motion and set a status hearing date for December 13, 2007.

¶ 14 On November 27, 2007, Rebecca filed a motion to extend time for discovery, which the trial court granted "until further order from the court." After negotiations and a hearing before the trial court, the corporations entered into a "Stipulation and Order" with Rebecca, which provided that the corporations would produce certain documents, including "all documents in their possession pertaining to monetary and non-monetary benefits awarded to [Mike]" and "all papers of incorporation" of Hluska and Good Times, and Rebecca would withdraw her subpoenas of the corporations without prejudice.

¶ 15 On June 15, 2008, Mike filed a Rule 13.3.1 financial disclosure statement (Cook Co. Cir. Ct. R. 13.3.1 (eff. Jan. 1, 2003)), in which he reported his gross monthly income as $6,933.00. He reported that he paid real estate taxes on his current residence in the amount of $266.67. He also reported credit card debt of $5,500 and reported a loan from Hluska in the amount of $7,000, of which $2,000 he listed as payment that he made for Rebecca's attorney fees. He further reported an interest in a pension plan with Laborers Local Union 41, but did not indicate an amount for that interest.

¶ 16 On September 15, 2008, Rebecca filed a Rule 13.3.1 financial disclosure statement (Cook Co. Cir. Ct. R. 13.3.1 (eff. Jan. 1, 2003)), in which she reported that she was unemployed, and received monthly rental income from a residence which she has owned prior to her marriage to Mike. The amount of total income she reported from the rental property is $800, "less real estate taxes" and "fire insurance," for a net monthly income of $302. She also reported monthly miscellaneous expenses of $949, which included $804 for the mortgage payment on the marital home. Rebecca reported credit card debts of $33,750.83, which she listed as payment for "living expenses" and $10,759.59 for "miscellaneous expenses" for a total debt of $44,510.42. She also reported loans from family members totaling $36,760, of which she listed $27,760 as payment for "travel, family events" and $9,000 for payment for her attorney fees. Rebecca further reported a Roth IRA with a value of $8,736 and a 401(k) retirement savings account with a value of $34,737.

¶ 17                                                 B. Trial Testimony

¶ 18 On September 16, 2008, a trial was held and there is no trial transcript in the record. Instead, the record contains a bystander's report, certified by the trial court on October 19, 2010, pursuant to Illinois Supreme Court Rule 323(c). Ill. S. Ct. R. 323(c) (eff. Dec. 13, 2005). Besides testifying on her own behalf, four other witnesses were called in Rebecca's case in chief: (1) Mike; (2) Mike's brother, John; (3) Rebecca's mother, Lida; and (4) Rebecca's brother, Corey.

¶ 19     Mike testified that, since the parties' separation in 2001, he has been residing in a home owned by his sister, Kathy, located in Hammond, Indiana. He testified that he has no written lease or agreement for the purchase of the property. He testified that, instead of paying rent, he orally agreed with Kathy to pay real estate taxes on the home and make improvements to the property. He also stated that he had no agreement with Kathy as to how long he could remain in the home.

¶ 20     Mike testified that, after the parties separated in 2001, he contributed $500 per week to Rebecca to assist with the mortgage payment of $668 per month on the marital home and to provide child support. He testified that after their daughters went to college, Mike reduced his contribution amount to $350 per week to assist in the mortgage payment only. He testified that he stopped his weekly contributions after Rebecca filed her petition for dissolution.

¶ 21     Mike testified that, from 1981 to 1984, he owned a pavement seal coating company called Master Seal. Mike testified that Rebecca "performed numerous and continuous work" for Master Seal. He testified that Master Seal was sold in 1984 and that his share of the sale proceeds were deposited into a joint bank account with Rebecca. He testified that the money in the account was used as a down payment for the parties' marital home.

¶ 22     Mike testified that he was also employed as a laborer and later a maintenance foreman with a company called Narco, but did not testify when he started work for that company. He testified that while he was employed at Narco he also worked part time with Hluska. He testified that his employment was terminated with Narco "5 to 6 years ago," which would have been approximately the year 2003. He testified that after his employment was terminated at Narco, he began working full-time with Hluska, "approximately 8 years," which would have been approximately the year 2001. However, as will be shown, Mike's testimony as to the dates he began working at Hluska conflicts with Rebecca's and John's testimony and tax documents received into evidence, which show that Mike worked for Hluska starting in the 1990s.

¶ 23     Mike testified that his pay, like the pay of his brother and sisters, was a "take home of $1,000 per week." He testified that at the end of the year, the corporation's accountant would create W-2s for the four of them that would result in a net pay of $1,000 per week. He also testified that, if corporate taxes had any tax obligations, the corporation would pay them and any refunds were deposited into the company's business account. He also testified that he had the use of a pickup truck owned by the corporation.

¶ 24     Mike testified that Rebecca had worked part-time for Hluska and received a paycheck from the company. He testified that Rebecca "did very little for Hluska" and that she may have occasionally volunteered her time in "getting affidavits for fireworks sales, and possibly as a ticket taker, but neither was for very long."

¶ 25     Mike testified that he does not recall receiving any stock certificate or other documentation of his stock ownership. However, he also testified that "[h]e received stock from the account and profit sharing." Mike testified that he was "unsure" of the percentage of his ownership interests in each of the corporations. He testified that he believed the percentage of his ownership interests was approximately 15% in Hluska and 20% in Good

Times.

¶ 26 Mike testified that he never received any distributions or dividends from Hluska or Good Times and that he only receives his "W-2 wages." However, a copy of the parties' 1993 joint income tax return was then offered and received into evidence which reported that Mike received a distribution from Hluska that year. As a result, Mike acknowledged that he had received a distribution from Hluska in 1993. The 1993 joint income tax return reported that Mike owned 7.5% of Hluska's stock and that he received a distribution in the amount of $18,358.30.

¶ 27 The following documents were offered and received into evidence: a copy of Mike's Rule 13.3.1 financial disclosure statement and Mike's W-2 tax forms from Good Times and Hluska for the years 2003, 2004, 2005, and 2007. In 2003, Mike's combined wages totaled $83,400; in 2004, he earned $83,200; in 2005, he earned $81,600. Mike testified that he did not know why his 2007 W-2 tax forms reported his combined wages as $84,800, because he receives only $1,000 per week.

¶ 28 Rebecca testified that she currently resides in the marital home, located on Ridgewood Avenue in Lansing, Illinois. Rebecca testified that she and Mike purchased the marital home in 1998 for $61,000 and financed the balance of the sale price through a mortgage from a bank. She also testified that she made all the payments on the mortgage after Mike moved out of the home.

¶ 29 Records of the mortgage statements from the bank that issued the mortgage on the marital home were received into evidence. According to the mortgage statements, the current monthly mortgage payment, as of August 11, 2008, was $804. The remaining principal balance owed on the mortgage was $6,366. The trial court also received into evidence from Rebecca an appraisal of the marital home, which valued the home at $130,000.

¶ 30 Rebecca testified that she was previously married in 1976, which was dissolved in 1981. She testified that she and her previous husband purchased a home located on Lorenz Avenue in Lansing, which a court awarded to her in 1981 as part of the parties' dissolution settlement. She testified that she leases the Lorenz residence for $800 per month. She testified that there is no outstanding mortgage on the residence and that her expenses for the residence, including real estate taxes, insurance and repairs, total $498 per month.

¶ 31 Rebecca testified that, prior to her marriage to Mike until 1985, she was employed as a secretary at St. Catherine Hospital in East Chicago, Indiana. She testified that she "typed contracts and billings" for Master Seal at night while working for St. Catherine Hospital during the day. She testified that she stopped working in 1985, but that she returned to work at American Health Care in 1990 working as an admission director until 1997. She testified that in 1998, she worked as "a consultant on her own and was hired as a marketing consultant by Richard Haskall, to work at 2 [nursing] homes, Bell Haven and Red Oaks," earning $42,000 per year. In 2005, she was hired by Bell Haven and promoted to marketing director earning $60,000 per year plus commission. Rebecca testified that her position was eliminated in 2006 after Bell Haven was purchased by new owners. She testified that she then worked for Horizon Physical Therapy from January 2007 as a marketing representative earning $25 per hour on a part-time basis. She testified that she was terminated in April 2007 and has

been unable to find employment since. She also testified that all clerical positions that she has applied for have required computer skills which she claims she lacks.

¶ 32 Rebecca testified that in 1991, she and Mike started working for Hluska's fireworks business. She did not testify whether she and Mike worked on a full- or part-time basis. However, she testified that during "fireworks season," which she explained was the period of time from Memorial Day through July 4th, she worked at the fireworks business from 9 p.m. to midnight every night, after working at her regular, full-time employment. She further testified that she worked "every season and every event until their separation in 2001." She testified that "they did fireworks, a haunted house at Halloween time, and Christmas sales." She testified that she "sold tickets, helped set up before events, worked as cashier, went to [the] currency exchange, and any other tasks that were requested of her." She testified that she was not paid for her work, and her compensation was included in the money and benefits that Mike received. She also testified that her mother, father, and two brothers also worked at the fireworks business. She did not testify as to whether they were compensated for their work.

¶ 33 Rebecca testified that she has obtained loans from some of her family members. She obtained a loan from: (1) her mother, Lida, in the amount of $27,760; (2) her brother, Corey, in the amount of $2,500; and (3) two loans from her brother, Kendall, in the amount of $1,500 and $5,000. Four promissory notes executed by Rebecca for each of the four loans from her family members were offered and received into evidence. Rebecca testified that she needed to borrow the money from her family for: college visits with her daughters; mortgage payments on the marital home; utility payments; vacations with her daughters; and attorney fees. Rebecca also testified that she has credit card debt of approximately $37,000 that she incurred for routine living expenses for herself and her daughters. Copies of her monthly credit card statements were offered and received into evidence.

¶ 34 Lida and Corey each testified to their relationship with Rebecca, the amount that she borrowed from them, and that each expect the debt owed to them to be repaid.

¶ 35 Mike's brother, John, testified that he was an "equal one-half owner[ ]" of Master Seal with Mike. He testified that Mike contributed $1,000 to the company. He testified that he and Mike later sold the company in 1987 and that payment of all the company's outstanding bills was split between him and Mike and a third party, Jerry Andrisko, who "helped with the company's equipment."

¶ 36 John testified that he and his wife incorporated Hluska in 1990, with his portion of the sale proceeds from Master Seal. He testified that his first business venture was the Reaper's Realm haunted house, but he later expanded the company to include a retail fireworks store in Indiana. He testified that in 1992 he asked Mike and their two sisters, Kathy and Cindy, and their mother, Katheryn, "to help with the company." John testified that instead of regular pay, Mike, his two sisters, and their mother were allowed to use a company vehicle. He also testified that he "gifted" all his family members a percentage interest in the corporation and that no one contributed money for his or her interest. After the initial "gift," the percentage of shares of Hluska was distributed as follows: Mike with 7.5%, John with 7.5%, Cindy with 28%, Kathy with 40%, and Katheryn with 17%.

¶ 37    John testified that in 1995, he incorporated Good Times and "gifted" a 25% interest to Mike and their two sisters. As with Hluska, John testified that no monetary contribution was provided in exchange for receiving an ownership interest. John also testified that in 1995, Katheryn no longer wanted to be involved in the business and "gifted" her shares to each of the four other shareholders, which brought Mike's percentage in Hluska up to 11.75%.

¶ 38    John testified that in 1998, Mike began receiving a "regular paycheck from the company" and that the current amount of his "take home pay" is $1,000 per week. John did not testify to the amount Mike was paid or the frequency with which he was paid before 1998. He testified that "depending on the time of the year and the project, the pay comes from one or the other company and all owners of the business were paid in this fashion." He also testified that "the corporations are meant to provide[ ] income and security for himself, and his brother and sisters." He further stated that, together, the two corporations "gross over two million dollars" per year.

¶ 39    John testified that the two corporations did not follow any corporate formalities such as shareholder or director meetings, and that no stock certificates were ever issued or exist, no shareholder agreements were drafted, and no transfer or assignment of stock was performed by an accountant. John also testified that he had contacted the corporations' former attorney, who had since retired, and that the attorney's secretary was unable to locate any files concerning Hluska or Good Times.

¶ 40    Rebecca did not present any expert testimony as to the value of the ownership interests in the corporations. Rebecca then offered and the trial court received into evidence the following documents, which are included in the record on appeal: Hluska's corporate tax returns for the years 2005 and 2006; Good Times's corporate tax returns for the years 2004 and 2005; Mike's W-2 tax forms from Good Times and Hluska for the years 2003, 2004, 2005, and 2007; and Mike's W-2 tax form from Good Times for the year 2006. Also offered and received into evidence was a 1999 W-2 tax form that reported wages of $252 for Rebecca, which she earned from Hluska.

¶ 41    Hluska's and Good Times's corporate tax returns reported that Mike owned 11.75% and 25% of the corporations's stock, respectively. After those documents were offered and received into evidence, Rebecca rested. Mike did not call any witnesses on his own behalf and rested.

¶ 42                                C. Trial Court's Findings

¶ 43    On March 6, 2009, the trial court issued its oral rulings and awarded the parties a dissolution of marriage based on the grounds of irreconcilable differences.

¶ 44    The trial court classified Mike's ownership interest in Hluska and Good Times as marital assets. The court found that, since Mike's ownership interests in the corporations were acquired during the marriage, the presumption was that the assets were marital. The trial court also found that Mike was unable to show donative intent or actual delivery because there were no stock certificates issued, and as a result, Mike could not establish that he received his interest in the corporations as a gift. The court further found that "[i]t appears that with the stock came an expectancy that the individual would work full time for the

-8-

businesses and participate and share in the profits."

¶ 45    The trial court did not assign a value to Mike's ownership interests in the corporations and did not make a division of Mike's ownership interests. The trial court noted that no evidence of value of Mike's ownership interest in the corporations was presented during the trial. The trial court found that it was the burden of both parties to present sufficient proof of value to the court and that both failed to do so, and as a result, the trial court was unable to ascertain a value of Mike's ownership interests in the two corporations. The trial court then awarded Mike all of his ownership interests in Hluska and Good Times.

¶ 46    The trial court classified the marital home as a marital asset and accepted the appraisal value of the home as $130,000. The court found that the remaining mortgage at the time of trial was approximately $4,000 and it "[gave] credit to Rebecca for principal reduction of $30,000 during the period of separation" for a value of $96,000. The trial court found that although Mike made voluntary payments during the time of the parties' separation, the court considered those payments as child support. The trial court awarded the marital home to Rebecca, stating:

> "I *** have considered the use of the marital funds in improving the property that [Mike] lives in. I have also considered that I am awarding all of the stock in Hluska and Good Times to [Mike]. In lieu of that, I am [awarding] the home to Rebecca free and clear."

¶ 47    The trial court classified the Lorenz residence as Rebecca's nonmarital property and did not assign it a value. The trial court determined that, based on Rebecca's 2007 tax return, she receives $6,670 from the rental of the property. The trial court found that the net income does not include a reduction for repairs.

¶ 48    The trial court classified Rebecca's debt to her family members of $36,760 as nonmarital. The court found that: (1) the promissory notes "were not signed contemporaneously"; (2) there was "no obligation to repay the loans"; (3) the promissory notes "do not provide for interest"; and (4) there was no evidence that Mike was aware of the loans.

¶ 49    Concerning maintenance, the trial court stated that it considered all the factors set forth in section 504 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/504 (West 2008)) in determining whether or not maintenance is appropriate. Specifically, the court considered the parties': (1) incomes and stability of employment; (2) future prospects to acquire income and assets; (3) the standard of living enjoyed during the marriage; (4) age and health issues; and (5) education, as well as, (6) the allocation of marital and nonmarital assets and debts; and (7) the duration of the marriage. See 750 ILCS 5/504 (West 2008). After considering those factors, the court ordered Mike to pay Rebecca maintenance in the amount of $2,500 per month for a period of 24 months, subject to review or modification. The trial judge stated:

> "I will also consider that if there is a catastrophic change of circumstances within that 24-month period, such as losing your job or some other major change, I will consider a petition to modify. So, coupled with the award of maintenance, I am also going to direct Rebecca to continue to be responsible for [her] credit card[ ] obligations [of $44,510.42] during that time period. ***

For the record, upon a review or petition to modify, the Court will consider the credit card obligation part and parcel of maintenance. So, therefore, I would also reserve a final allocation of any of those debts. In the meantime, I am directing Rebecca to continue to pay her credit card debts on a monthly basis."

The trial court also ordered Mike to be responsible for his own credit card debt of $13,078.08.

¶ 50    The trial court classified Rebecca's attorney fees as a marital obligation and ordered Mike to pay $12,000 as a "contribution" toward those fees and ordered Rebecca to be "solely responsible for the balance," *i.e.*, $16,739. The court further classified the parties' pension plans and retirement accounts as marital and awarded an equal interest in those funds to each.

¶ 51    In sum, the trial court's classified, valued and assigned the parties' marital and nonmarital assets and debts as follows:

| Asset / Debt | Classification | Value | Awarded To |
|---|---|---|---|
| Ownership Interest Hluska | Marital | Not Valued | Mike |
| Ownership Interest Good Times | Marital | Not Valued | Mike |
| Marital Home | Marital | $96,000.00 | Rebecca |
| Lorenz Rental Property | Nonmarital | Not Valued | Rebecca |
| Rebecca's Debt to Family | Nonmarital | ($36,760.00) | Rebecca |
| Rebecca's Credit Card Debt ("Reserved with maintenance") | Not Classified | ($44,510.42) | Rebecca |
| Michael's Credit Card Debt | Nonmarital | ($13,078.08) | Mike |
| Rebecca's Attorney Fees | Marital | ($12,000.00) | Mike |
|  |  | ($16,739.00) | Rebecca |
| Retirement Plans & Pensions | Marital | 50% | Mike |
|  |  | 50% | Rebecca |

¶ 52    On June 3, 2009, the trial court entered its written judgment of dissolution. Concerning maintenance, the trial court stated as follows:

"5. [Mike] shall pay to [Rebecca], as and for maintenance, $2,500.00 per month, for 24 months. Said maintenance shall be reviewable and modifiable. The Court orders [Rebecca] to continue payments on her credit card debt, and specifically does not allocate that debt between the parties at this time. On any review or request to modify maintenance, the Court will consider, along with all other factors, the credit card obligations of [Rebecca]. "

¶ 53    On June 29, 2009, Mike filed a "Motion to Reconsidered Judgement," which was denied, and this timely appeal follows.

¶ 54                                              II. ANALYSIS

¶ 55    On appeal, Mike claims that the trial court erred in: (1) apportioning marital assets, maintenance, and attorney fees without first valuing all marital and nonmarital assets; (2)

reserving the allocation of Rebecca's credit card obligations; and (3) classifying Mike's ownership interests in two corporations as marital assets.

¶ 56    As an initial matter, Rebecca requests that we dismiss Mike's appeal for failing to include a complete table of contents to the record on appeal in accordance with the provisions of Illinois Supreme Court Rule 342(a) (eff. Jan. 1, 2005). Under Supreme Court Rule 342(a), an appellant's brief must include "as an appendix, *** a complete table of contents, with page references, of the record on appeal." Ill. S. Ct. R. 342(a) (eff. Jan. 1, 2005). Mike's appellant brief does not contain a table of contents to the record on appeal, and contains only a one-page table of contents, with page references, to the appendix attached to his appellant brief.

¶ 57    Supreme court rules are not advisory suggestions, but rules to be followed. *In re Estate of Michalak*, 404 Ill. App. 3d 75, 99 (2010). Since Mike's appellant brief fails to follow the provisions set forth in Supreme Court Rule 342(a), we may, within our discretion, dismiss his appeal for his failure to do so. *Fender v. Town of Cicero*, 347 Ill. App. 3d 46, 51 (2004) (citing *Collier v. Avis Rent A Car System, Inc.*, 248 Ill. App. 3d 1088, 1095 (1993)).

¶ 58    We agree with Rebecca that Mike's appellant brief does not include a complete table of contents to the record on appeal as required by Supreme Court Rule 342(a). However, we observe that the argument section of Mike's appellant brief does comply with the provisions of Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008), providing references to the volume and pages of the record on appeal so that we are able to assess whether the facts Mike presents are accurate and a fair portrayal of the events in this case. We choose to exercise our discretion and address the issues he claims on appeal on its merit.

¶ 59                        A. Apportioning Marital Assets

¶ 60    First, Mike claims that the trial court erred in failing to assign value to all of the parties' assets prior to apportioning the marital assets, awarding maintenance, and attorney fees. Specifically, Mike contends that the trial court did not place a specific value on Rebecca's Lorenz residence or on his ownership interests in Hluska and Good Times. Mike argues that the trial court's failure to value those assets was an abuse of discretion and that this court should reverse and remand the matter back to the trial court for a determination of its value and then reallocate the marital assets and reconsider the awards of maintenance and attorney fees.

¶ 61    Under the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 *et. seq.* (West 2008)), a court must classify the property as either marital or nonmarital before it may dispose of property upon a dissolution of marriage. 750 ILCS 5/503(c) (West 2008). After classifying the property, the trial court gives to each spouse his or her nonmarital property, and the marital property is divided into "just proportions." 750 ILCS 5/503(d) (West 2008). In order to divide the marital property in just proportions, the trial court first must establish the value of the parties' marital and nonmarital assets. *In re Marriage of Cutler*, 334 Ill. App. 3d 731, 736 (2002). However, the Act does not require the court to place a specific value on each item of property. *In re Marriage of Hagshenas*, 234 Ill. App. 3d 178, 200 (1992). A trial court's distribution of marital property should not be reversed

absent a showing that the trial court abused its discretion. *In re Marriage of Sanfratello*, 393 Ill. App. 3d 641, 648 (2009). "A trial court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *In re Adoption of S.G.*, 401 Ill. App. 3d 775, 784 (2010).

¶ 62 We do not find Mike's argument persuasive that the trial court's failure to specifically value his ownership interests was an abuse of discretion and warrants reversal and a rehearing. Neither party provided the trial court with any evidence concerning the value of either asset. Our review of the record shows that Mike had sufficient opportunity during pretrial discovery and during trial to present evidence on the value of these two assets. Discovery was open for more than two years and there is no indication in the record that Mike sought an appraisal of the Lorenz property or employed an expert to determine the value of his ownership interests in the two corporations. At trial, Mike had an additional opportunity to present evidence of the value of these assets, but he failed to do so.

¶ 63 Concerning Mike's ownership interests, the record shows that Rebecca filed two motions to compel discovery against Mike, each of which requested an estimate value of his ownership interests, which he failed to provide. In addition, Hluska sought to prevent Rebecca from obtaining information as to the value of Mike's ownership interest and initiated a motion to quash Rebecca's subpoenas to obtain the information.

¶ 64 Mike cannot fail to disclose information on value of the assets at issue and then complain that the trial court erred in not placing a specific value on them. See *In re Marriage of Sanfratello*, 393 Ill. App. 3d at 650-51 (trial court's failure to provide a " 'specific determination of value' " was not an abuse of discretion when husband did not disclose to certified public accountant and trial court "necessary financial documents" needed to evaluate the worth of his three businesses); *In re Marriage of Tyrrell*, 132 Ill. App. 3d 348 (1985) (trial court's refusal to assign a value to stock was not an abuse of discretion because the husband failed to provide sufficient evidence of the value of the corporation); *In re Marriage of Bauer*, 138 Ill. App. 3d 379 (1985) (wife's failure to present any evidence as to value of her corporation did not mandate reversal and remand for new hearing to determine its value); In re *Marriage of Smith*, 114 Ill. App. 3d 47 (1983) (trial court did not err in refusing to reopen case for admission of evidence of value of marital property when neither party provided evidence of the property's value at trial); *In re Marriage of Thornton*, 89 Ill. App. 3d 1078 (1980) (trial court refusal to value property not abuse of discretion when parties failed to comply with court's order to have the property appraised).

¶ 65 This court, in *In re Marriage of Smith*, has previously stated:

"[I]t is the parties' obligation to present the court with sufficient evidence of the value of the property. Reviewing courts cannot continue to reverse and remand dissolution cases where the parties have had an adequate opportunity to introduce evidence but have failed to do so. Parties should not be allowed to benefit on review from their failure to introduce evidence at trial. [Citations.] Remanding cases such as the one before us would only protract the litigation and clog the trial courts with issues which should have been disposed of at the initial hearing. As the trial court here said after numerous hearings in

-12-

this case, at some point we must 'ring the curtain down.' " *In re Marriage of Smith*, 114 Ill. App. 3d at 54-55.

Thus, we cannot say that the trial court abused its discretion in distributing the martial property in "just proportions" without placing a specific value of either Rebecca's Lorenz property or Mike's ownership interests in Hluska and Good Times when neither party presented any evidence of their value to the trial court.

¶ 66                    B. Reserving Allocation of Rebecca's Credit Card Obligations

¶ 67        Next, Mike claims that the trial court erred in reserving allocation of Rebecca's credit card obligations for determination at a later date. Specifically, Mike contends that the trial court bifurcated the dissolution judgment and reserved its determination of Rebecca's credit card debt obligations without a finding that appropriate circumstances existed to warrant bifurcation.

¶ 68        Section 401(b) of the Act explicitly authorizes a court to "enter a judgment for dissolution that reserves *** issues *** upon (i) agreement of the parties, or (ii) motion of either party and a finding by the court that appropriate circumstances exist." 750 ILCS 5/401(b) (West 2008). This is known as a bifurcated judgment. See *In re Marriage of Kenik*, 181 Ill. App. 3d 266, 270 (1989).

¶ 69        We do not find Mike's contention persuasive that the trial court bifurcated the judgment in this case. We cannot find anything in the record showing, and neither party alleges, that they agreed to reserve the determination of Rebecca's credit card obligations for a later determination, nor do we find a motion by either party seeking to bifurcate the judgment for dissolution concerning any issue.

¶ 70        Even if we agreed with Mike that the trial court bifurcated the judgment for dissolution, we would then lack jurisdiction to hear his appeal. Rebecca, in her appellate brief, correctly recognized that the trial court's judgment of dissolution does not contain Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010) language that "there is no just reason for delaying either enforcement or appeal" of the court's prior rulings. Without Rule 304(a) language, a bifurcated judgment is not final and appealable. See *In re Marriage of Bogan*, 116 Ill. 2d 72, 75-76 (1986) (an order bifurcating a judgment is appealable with a Rule 304(a) finding, but that only the propriety of the bifurcation is reviewable); *In re Marriage of Kenik*, 181 Ill. App. 3d at 270.

¶ 71        We recognize that the trial judge's use of the term "reserve" in discussing Rebecca's credit card obligations may have caused confusion. In support of his argument, Mike points to the trial court's oral ruling and then its judgment of dissolution in which the trial judge stated that the court would "consider [Rebecca's] credit card obligation part and parcel of maintenance" and "would *reserve* the final allocation of any of those debts." (Emphasis added.)

¶ 72        However, as the Second District, in *In re Marriage of Mardjetko*, 369 Ill. App. 3d 934 (2007), stated:

"[T]rial courts sometimes describe issues as being 'reserved' when, in fact, the court has

-13-

*decided* the issue (usually based on circumstances it expects to be temporary), but intends to revisit the issue soon. Such a use of the word 'reserved' nearly guarantees confusion. The Act uses the word 'reserves' specifically for instances where the court is bifurcating judgment. Where it is unmistakable that a trial court is using the word in a sense that does not defeat the finality of the judgment, we will not frustrate that intent by adhering to the meaning of 'reserves' in the Act." (Emphasis in original.) *In re Marriage of Mardjetko*, 369 Ill. App. 3d at 937.

¶ 73    Here, the trial court decided the issue of Rebecca's maintenance when it awarded her $2,500 per month for a period of 24 months, subject to review or modification. Although the trial court used the term "reserved" when discussing Rebecca's credit card obligations, the trial court made clear in its oral ruling that Rebecca was responsible for paying her credit card obligations and that it would be considered only "*upon a review or petition to modify*" and, at that time, as a factor "*along with all other factors*" in whether to grant or deny such a petition. For all these reasons, we conclude that the trial court decided the issue of maintenance and did not bifurcate the judgment as Mike claims.


¶ 74                    C. Classifying Ownership Interest as Marital Property

¶ 75    Last, Mike claims that the trial court erred in classifying his ownership interest in Hluska and Good Times as marital property. Specifically, Mike argues that his ownership interests in the two corporations should not be considered marital property because he received his ownership interests as a gift from his brother, John, and later from his mother, Katheryn, and did not provide any monetary consideration for his interests.

¶ 76    As previously stated, before a trial court may dispose of property upon a dissolution of marriage, it must classify the property of the parties as either marital or nonmarital. *In re Marriage of Hagshenas*, 234 Ill. App. 3d 178, 186 (1992). The trial court's classification will not be disturbed unless it is contrary to the manifest weight of the evidence. *In re Marriage of Lundahl*, 396 Ill. App. 3d 495, 502 (2009). "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995).

¶ 77    Section 503(b)(1) of the Act provides that "all property acquired by either spouse after the marriage and before a judgment of dissolution of marriage *** is presumed to be marital property." 750 ILCS 5/503(b)(1) (West 2008). "The Act thus creates a rebuttable presumption that all property acquired after the date of the marriage is marital property regardless of the manner in which title is held." *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 670 (2008) (citing *In re Marriage of Didier*, 318 Ill. App. 3d 253, 258 (2000)). This presumption may be overcome by a showing that the property was acquired by an enumerated exception listed in subsection (a) of section 503 of the Act. See 750 ILCS 5/503(a) (West 2008). One such enumerated exception is a showing that the property acquired after marriage was "acquired by gift, legacy, or descent." 750 ILCS 5/503(a)(1) (West 2008). It is the burden of the party claiming that property acquired during the marriage is nonmarital to prove by clear and convincing evidence that the property falls within an

-14-

enumerated exception. *In re Marriage of Didier*, 318 Ill. App. 3d 253, 258 (2000).[2] "Any doubts as to the nature of the property are resolved in favor of finding that the property is marital." *In re Marriage of Hegge*, 285 Ill. App. 3d 138, 141 (1996); 750 ILCS 5/503(a) (West 2008).

¶ 78    A "gift" is defined as a " 'voluntary, gratuitous transfer of property by one to another,' " and it is " 'essential to a gift that it should be without consideration.' " *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 401 (2010) (quoting *Martin v. Martin*, 202 Ill. 382, 388 (1903)); see also *In re Marriage of Agazim*, 147 Ill. App. 3d 646, 648-49 (1986) (defining a "gift" as "a voluntary, gratuitous transfer of property by one to another where the donor evidences an intent to make such a gift and absolutely and irrevocably delivers the property to the donee"); Black's Law Dictionary 619 (5th ed. 1979) ("[a gift] is a voluntary transfer of property to another made gratuitously and without consideration"). Consideration is defined as "a bargained-for exchange of promises or performance." *Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1027 (2007); *Village of South Elgin v. Waste Management of Illinois, Inc.*, 348 Ill. App. 3d 929, 940 (2004). "A valid gift requires proof of donative intent and delivery of subject matter." *In re Marriage of Schmidt*, 242 Ill. App. 3d 961, 968 (1993).

¶ 79    In this case, there is no dispute between the parties that Mike's ownership interests in the Hluska and Good Times were acquired during the marriage and thus are presumed to be marital property. However, Mike claims that he acquired a 7.5% ownership interest in Hluska and a 25% interest in Good Times from his brother, John, and later, an additional 4.25% ownership interest in Hluska from his mother Katheryn, as gifts. Thus, Mike argues, the trial court erred in not classifying them as nonmarital property because the gift exception under section 503(a)(2) of the Act applies.

¶ 80                              1. John's "Gift"

¶ 81    As for the transfer of the ownership interests from John, Mike argues these are gifts because John testified to his intention to transfer ownership interests in the two corporations to Mike as a gift, which satisfied the requirement of donative intent. See *Didier*, 318 Ill. App. 3d at 263 (" 'evidence *most* relevant in determining donative intent is the donor's own testimony' " (emphasis in original) (quoting *In re Marriage of Simmons*, 221 Ill. App. 3d 89, 92 (1991))). He also argues that he satisfied the element of actual delivery because the corporations' tax returns report the percentage of stock that is allocated to him. Mike does not cite any case law to support this proposition.

¶ 82    We cannot say that the corporations's tax returns reporting the percentage of stock allocated to Mike are sufficient evidence to satisfy the element of actual delivery. The evidence in this case showed that no stock certificates were ever issued; therefore, there is no evidence to show that shares of stock were transferred from John to Mike without

---

[2]In *Didier*, this court declined to follow the rule set forth in a case from the Second District, *In re Marriage of Blunda*, 299 Ill. App. 3d 855 (1998), where that court placed the burden of proof on the party *challenging* the gift. *Didier*, 318 Ill. App. 3d at 259 n.1.

consideration. John testified that no transfer or assignment of stock was ever performed. The only evidence of delivery, if any, is the conclusion on the corporate tax returns showing Mike's percentage of interest.

¶ 83    We also cannot say that Mike's ownership interests are nonmarital in nature. It appears that the companies grew over time. Hluska was incorporated in 1992, operating a year-round haunted house, and later added a fireworks store. Good Times was incorporated in 1995 for fireworks sales.

¶ 84    In 1992, during the parties' marriage, Mike started to work on a part-time basis for Hluska at its inception without receiving regular pay, but instead was allowed use of a company vehicle. Mike and Rebecca's joint tax return from 1993 showed that Mike's income from Hluska was approximately $18,000 which he received as a distribution. According to John, in 1998, Mike was working full-time for the two corporations and began receiving a paycheck on a regular basis with a "take home pay" of $1,000 per week. According to Mike's W-2 tax form in 2005, the year Rebecca filed for the dissolution of marriage, Mike's combined wages earned from Hluska and Good Times was $81,600. Also in 2005, Hluska and Good Times reported combined gross sales of $2,148,625 and a reported combined total income of $938,982.

¶ 85    When John gave Mike percentages of interest in the companies, both Rebecca and Mike were working for the companies together. Rebecca testified that she worked "every season and every event [with Hluska] until their separation in 2001." She testified that during the "fireworks season," she worked selling fireworks for the business from nine p.m. to midnight in addition to working her regular full-time employment. Mike does not dispute those claims. Rebecca also testified that she was not paid for her work, and her compensation was included in the money and benefits that Mike received. Mike claims that she was paid for her work with the companies, but there is only one W-2 in the record for Rebecca from Hluska which she received in 1999 in the amount of $252, which was offered by Rebecca and received into evidence. Mike did not present any evidence that Rebecca was paid for the work she performed at Hluska.

¶ 86    In considering this evidence it would appear that Mike received a percentage of ownership in both companies for his work and Rebecca's work in helping the companies grow during their marriage. As a result, we cannot find that Mike proved by clear and convincing evidence that he acquired his ownership interests as gifts because he was unable to overcome the presumption that his interests were marital property.

¶ 87                           2. Katheryn's "Gift"

¶ 88    Next, in addressing Katheryn's alleged gift to Mike of her interests in Hluska, we recognize that the same presumption exists here. In addition to the presumption that property obtained during a marriage is marital property (750 ILCS 5/503(b) (West 2008)), " '[t]here is [a further] presumption that a transfer from a parent to a child is presumed to be a gift.' " *Didier*, 318 Ill. App. 3d at 258-59 (quoting *In re Marriage of Hagshenas*, 234 Ill. App. 3d 178, 186 (1992)). " 'In cases where a determination of the nature of the property at issue [is] found to be subject to these conflicting presumptions, the presumptions are considered to

cancel each other out ***.' " *Didier*, 318 Ill. App. 3d at 258-59 (quoting *In re Marriage of Hagshenas*, 234 Ill. App. 3d 178, 186-87 (1992)); see also *In re Marriage of Hunter*, 223 Ill. App. 3d 947, 952 (1992); *Agazim*, 147 Ill. App. 3d at 648; *In re Marriage of Rosen*, 126 Ill. App. 3d 766, 772-73 (1984). In other words, the presumption that all property acquired after marriage is marital property is canceled out by the conflicting presumption of a gift from a parent to a child, and, thus, the trial court is free to determine the issue of whether the asset in question was marital or nonmarital property without resort to either presumption. *In re Marriage of Landfield*, 209 Ill. App. 3d 678, 696 (1991). The trial court's classification will not be disturbed unless it is contrary to the manifest weight of the evidence. *In re Marriage of Lundahl*, 396 Ill. App. 3d 495, 502 (2009). "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995).

¶ 89　　In this case, the trial court found that Mike failed to establish, *inter alia*, donative intent on his claimed gift. In a dissolution of marriage proceeding, there must be proof of donative intent and delivery of the subject matter for a gift to be valid. *Didier*, 318 Ill. App. 3d at 263 (citing *In re Marriage of Schmidt*, 242 Ill. App. 3d 961, 968 (1993)). This court has found that the "evidence *most* relevant in determining donative intent is the donor's own testimony." (Emphasis in original.) (Internal quotation marks omitted.) *Didier*, 318 Ill. App. 3d at 263 (quoting *In re Marriage of Simmons*, 221 Ill. App. 3d 89, 92 (1991)).

¶ 90　　Here, Katheryn did not testify at trial concerning her intention to gift to Mike of a portion of her interests in Hluska. Mike did not testify that he received a portion of her interest as a gift. The only testimony that Mike received those interests as a gift was from Mike's brother, John, which was hearsay evidence to which the trial court apparently gave little or no weight.

¶ 91　　In *Didier*, we found that there was additional evidence to show donative intent of a father's gift to his daughter without the father's testimony at trial. *Didier*, 318 Ill. App. 3d at 264. At issue in that case, similar to this case, was the father's conveyance of an ownership interest in a closely held corporation to his daughter. *Didier*, 318 Ill. App. 3d at 263. We found that donative intent was established when evidence was presented from the stock certificates showing the transfers made from the father to the daughter; the parties' stipulation that individual transfers of the corporation's stock to daughter were " 'gift[s] from [daughter's] family' "; and the trial court's ability to "examine the form of the [gifted stock] transfer *** in comparison with that [of other stock transfers from the corporation]." *Didier*, 318 Ill. App. 3d at 263-64.

¶ 92　　Here, however, we do not have such evidence as we had in *Didier* to find Katheryn's intention. No stock certificates were placed into evidence to show that the shares were transferred from Katheryn to Mike without consideration. There is no gift tax filings from Katheryn to show that she transferred her interests to Mike as a gift. See, *e.g.*, *In re Marriage of Blunda*, 299 Ill. App. 3d 855, 866 (1998) (father's filed gift tax return as evidence of donative intent). Without more than John's hearsay testimony that the transfer from Katheryn to Mike was a gift, we cannot say that the trial court's finding was against the manifest weight of the evidence.

¶ 93    Even if we did find Mike established the element of donative intent, we again would have the issue of whether the corporations' tax returns reporting the percentage of stock allocated to Mike is sufficient evidence to satisfy the element of actual delivery. As previously stated, the evidence in this case showed that no stock certificates were ever issued; therefore, there is no evidence to show that shares of stock were transferred from Katheryn to Mike without consideration. John testified that no transfer or assignment of stock was ever performed. The only evidence of delivery, if any, is the conclusion on the corporate tax returns showing Mike's percentage of interest, which we concluded was insufficient. In sum, we cannot say that the trial court's classification was against the manifest weight of the evidence.

¶ 94                               CONCLUSION
¶ 95    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 96    Affirmed.