2020 IL App (1st) 192335-U

SECOND DIVISION
July 28, 2020

No. 1-19-2335

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| TRACEY J. ELLIS, | ) | Petition for Direct Administrative |
| | ) | Review of a Decision of the Illinois |
| Petitioner-Appellant, | ) | Human Rights Commission. |
| | ) | |
| v. | ) | |
| | ) | No. 2019 CP 0313 |
| ILLINOIS HUMAN RIGHTS COMMISSION, | ) | |
| ILLINOIS DEPARTMENT OF HUMAN | ) | |
| RIGHTS, and LOYOLA UNIVERSITY | ) | |
| CHICAGO, | ) | |
| | ) | |
| Respondents-Appellees. | ) | |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

*HELD*: The Illinois Human Rights Commission did not abuse its discretion by sustaining the dismissal of petitioner's charge of public accommodation discrimination for lack of substantial evidence.

¶ 1     Petitioner-appellant Tracey J. Ellis (petitioner) appeals *pro se* from a final order entered by respondent-appellee the Illinois Human Rights Commission (Commission) sustaining respondent-appellee the Illinois Department of Human Rights' (Department) dismissal of her charge of public accommodation discrimination against respondent Loyola University Chicago (Loyola)[1]. Petitioner alleged that Loyola denied her full and equal enjoyment of its services based on her race in violation of section 5-102(A) of the Illinois Human Rights Act (Act) (775 ILCS 5/5-102(A) (West 2018)). The Department dismissed her charge for lack of substantial evidence. Petitioner sought review from the Commission, which sustained the Department's decision. She now appeals, contending that the Commission abused its discretion in sustaining the dismissal of her cause. She asks that we reverse the order entered by the Commission and that we "award [her] a settlement offer that is in violation of an enforced statute *** based on her race and color" and that we "reimburse her photocopy expenses." For the following reasons, we affirm.

¶ 2                                        BACKGROUND

¶ 3     Loyola issues alumni cards, which grant its alumni limited access to certain campus buildings and facilities including, for example, its libraries and computer centers. Petitioner is an alumna of Loyola and, in 2001, she obtained an alumni card.

¶ 4     In September 2018, petitioner filed a public accommodation discrimination charge with the Department alleging that Loyola denied her the full and equal enjoyment of its services because of her race, which she described as "black." In her petition, she averred that sometime in 2005, she went to one of Loyola's computer centers but was not allowed to enter because the alumni card she presented was expired. She recounted that, at that time, she

---

[1] Loyola did not file a brief in this appeal.

attempted to make an appointment with Loyola's president (white)[2] via his administrative assistant, Karen McCray (black). She alleged that McCray lied to her by telling her that the president does not meet with alumni and otherwise refused to help her, despite the fact that she (petitioner) acted appropriately and was not abusive in any way. After her interaction with McCray, petitioner went to Loyola's Campus Safety office and spoke to an officer (white) who told her Loyola was not renewing her alumni card due to negative comments in the alumni database under her name. Petitioner then called Jeremiah Martin (nonblack), assistant director of alumni relations, and told Martin over the phone about her interaction with McCray and that McCray had made false allegations against her in the database.

¶ 5    According to petitioner's filing, she did not return to Loyola until August 20, 2018, when she again went to the Campus Security office to renew her alumni card. She averred that this time, she spoke to Lieutenant Robert Langan (nonblack), who told her he would talk to Martin. Petitioner called Martin, who again told her Loyola would not renew her card, but also told her he would confer with Mary Houston, director of alumni relations (nonblack). Petitioner stated that Houston never approved her renewal. Petitioner insisted that she has never shown, in person or via mail, any behavioral problems with anyone from Loyola, that McCray is lying about their interaction from 2005, and that Martin and Houston --whom she admittedly never met in person and to whom she admittedly never disclosed her race--knew she was black via the tone of her voice during their phone conversations. In her filing, petitioner claimed she was denied full and equal enjoyment of Loyola's facilities and insisted that "[s]imilarly situated non-black alumni of [Loyola] have not been denied the opportunity to renew their alumni card."

_____

[2] These parenthetical racial designations were those provided by petitioner to the Department upon the filing of her petition.

¶ 6      Based on her petition, the Department conducted an investigation, interviewed Martin, and obtained the following evidence from Loyola. Martin stated that Loyola retains information about its alumni in a computerized alumni database and, when accessed, alerts regarding any particular alumnus, including anything from donation history to safety concerns, are visible. Martin recounted that, in November 2005, petitioner became combative and verbally abusive toward McCray when McCray denied her request to meet with Loyola's president about her alumni card and that, during the incident, petitioner refused to accept this denial, insisted on remaining in the office, and continued badgering McCray. McCray ultimately alerted the alumni relations office about what occurred, which created an alert in the alumni database under petitioner's name. Martin further detailed that this was not the only incident involving petitioner at the campus and that, since 2005, she has instigated several confrontations during which she swore at McCray, swore at others, called people names and used inappropriate language when communicating with several people at Loyola's Career Center. In addition, Martin stated that in November 2006, Loyola documented in its database a notice it gave petitioner that it would not renew her alumni card and she was not allowed back at Loyola's facilities because of her continued disruptive and inappropriate behavior at its Water Tower campus. He also described several voicemails he received from petitioner beginning in August 2018 about renewal of her alumni card. In one, petitioner called herself a "senior assistant director" and demanded he renew her card. Martin telephoned petitioner, told her the decision not to renew it was because of her inappropriate and abusive behavior and warned her that if she called again he would call Campus Safety for her arrest; petitioner continued calling and he stopped answering. In another voicemail, petitioner left a threatening message for Martin. Martin further recounted

that, in a subsequent incident, petitioner came to the campus and told a security officer that she had spoken to Martin and that Martin authorized the renewal of her card; the officer called Martin to verify this, and Martin explained to the officer that this was untrue. Martin confirmed that he is unaware of petitioner's race, as he has never met her in person and there is no ethnic identification in her computerized alumni file. Finally, Martin detailed that Loyola has prohibited the renewal of alumni cards to three non-black alumni--Barbara A. Kronau-Sorensen, Mickey Nichols, and Kevin Kutsch--for reasons similar to what occurred with petitioner, *i.e.*, engaging in inappropriate behavior at Loyola facilities.

¶ 7        Loyola provided the Department with copies of its Equal Opportunity, Affirmative Action and Non-Discrimination policy stating that it does not discriminate on the basis of race; its Code of Conduct policy stating that it requires community members to demonstrate respect for the rights of others and to behave accordingly while refraining from obstructing or disrupting normal facility activities; its University Community Standards stating that it strictly prohibits abusive, disruptive and disorderly conduct; its Campus Safety Department mission statement stating that its aim is to maintain a safe and secure environment for all; its Message from the Director stating that Loyola is committed to crime prevention and safety for all; and its building and facilities/alumni library access policies stating that Loyola's buildings and facilities are to be used for educational purposes only. Loyola also provided the Department with petitioner's database profile which included a copy of the alert notification from her 2005 encounter with McCray and a copy of the November 2006 notice she was given with respect to her disruptive behavior at the Water Tower facility. In addition, it turned over the voicemails petitioner left for Martin, as well as emails Martin sent to staff members documenting these occurrences. Loyola did not provide any documentation

regarding the three non-black alumni who had also been prohibited from renewing their cards, apart from Martin's statements.

¶ 8    Upon the close of its investigation, the Department concluded there was no evidence that Loyola denied petitioner the full and equal enjoyment of its services based on her race. It noted that the evidence showed Loyola's policies and practices require ethical and professional conduct, as well as respect and appropriate behavior for all by all, regardless of race. The Department described that its investigation revealed Loyola informed petitioner that her alumni card would not be renewed because of the negative notes in the database which were a direct result of her verbal altercations with multiple Loyola staff members, and that Loyola repeated the same in August 2018 when respondent tried to renew her card again. It also noted that Martin and Houston, who denied the renewal, did not have any knowledge of petitioner's race, as they never dealt with her in person, her race was not listed in the database, and she herself admitted she never disclosed her race to them during any of their communications. Accordingly, because the Department found that "[t]he investigation did not reveal, and [petitioner] did not show that [Loyola] denied her full and equal enjoyment of their facility due to her race" but, rather, "because of inappropriate behavior," it recommended a finding of lack of substantial evidence and dismissed her charge.

¶ 9    Petitioner filed a request for review of the Department's decision with the Commission, arguing that Loyola "denied [her] as the only minority the full and equal enjoyment of [its] facility" because "of her race, black and color light skinned." She insisted that she was "an alumni in good standing as evidenced by receipt of an alumni card in 2001, which verifies that [she] had strong ethics and credibility," and that Loyola "falsely alleged" the contrary with its accusations of "abusive, inappropriate behavior, etc.," which she "clearly denies."

She included allegations that Loyola "resents" her for "being a normal and responsible American born minority," and that "McCray, a foreign mixed race minority *** denigrated her credibility *** to make her appear unstable." She further stated that, due to McCray's "lies," Loyola falsely included "non-verifiable notes in the database" and that she (petitioner) "had determined that non-black employees[3] were treated more favorably under similar circumstances."

¶ 10    The Department responded that its investigation showed Loyola did not deny petitioner full and equal enjoyment of its services because of her race and that it denied her request to renew her alumni card because of instances during which she exhibited inappropriate behavior while visiting campus facilities, in violation of applicable campus rules. The Department detailed the incidents when petitioner swore at people, called employees names, and used inappropriate language, as well as the multiple occasions when Loyola explained to her it would not renew her alumni card because of these incidents. The Department also noted the instances when petitioner refused to leave employee offices, lied to staff in order to obtain renewal of her card, and left threatening voicemails on campus phones. In addition, while it acknowledged that Loyola had not provided supporting documentation regarding the three non-black comparatives who were similarly denied card renewals due to their inappropriate behavior, the Department noted Loyola did not need to, as petitioner failed to meet her *prima* facie case and that Loyola provided a legitimate nondiscriminatory reason for its actions, which was never proven to be pretextual. Thus, as the investigation did not reveal substantial evidence that she was denied full and equal enjoyment of Loyola's facilities

---

[3] Apparently, although petitioner asserted in her request to review what could be construed as an employment discrimination claim, the Commission understood that she intended to assert a public accommodation discrimination claim. We, along with the parties on appeal, in like instance, do the same.

because of her race, and because petitioner did not provide any evidence of discriminatory animus or name a comparative alumnus not in her protected class who was treated more favorably under similar circumstances, the Department argued that petitioner's charge could not stand.

¶ 11    Petitioner filed a reply, arguing that during the investigation, Loyola "lied about the fact that there were white alumni whom were denied also," since, as the Department admitted in its response, Loyola had not provided supporting documentation of the three nonblack comparatives, apart from Martin's statements, during the fact-finding investigation.  In addition to reasserting her claims of falsehoods perpetuated by various named Loyola employees, petitioner again insisted that Loyola "violated their policy" of assisting alumni with card renewals and did so against her specifically "based on her race, black, and color, light skinned american" in direct violation of the Act.

¶ 12    After discussing the required elements for a public accommodation charge and the evidence presented herein, the Commission issued its final administrative decision finding that the Department properly dismissed petitioner's claim for lack of substantial evidence. The Commission noted that Loyola presented documentation of its interactions with petitioner, none of which showed any evidence of racial animus, while petitioner failed to provide any evidence at all to show that the Department's dismissal of her charge was not in accordance with the Act.[4]  Accordingly, the Commission sustained the Department's dismissal of petitioner's charge.

_____

[4] The Commission, in its written decision, notes at one point that petitioner "alleges that she was also denied access based on her sex[ and] national origin" in addition to her "skin color," and states that "[t]o the extent that Petitioner is adding protected classes to her charge," it "does not have jurisdiction to consider claims raised for the first time" in her request for review.  From our review of the record, we presume this arises from a statement in petitioner's reply pleading to the Commission wherein she insisted that she "was the only American minority lite skinned and black female" who was refused renewal of her alumni card.  Were this to be considered an attempt by petitioner to assert additional protected classes for the first time during the Commission's review, we would agree with the

¶ 13                                    ANALYSIS

¶ 14        As a threshold matter, we note that compliance with Illinois Supreme Court Rule (Rule) 341(h) (eff. May 25, 2018) is mandatory, and a party's status as a *pro se* litigant does not relieve her of her noncompliance with appellate practice rules.  See *Voris v. Voris*, 2011 IL App (1st) 103814, ¶ 8 (compliance with rules governing briefs on appeal is compulsory regardless of a party's status); accord *Ryan v. Katz*, 234 Ill. App. 3d 536, 537 (1992); see also *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57 (our supreme court rules, including Rule 341, are not merely advisory suggestions; rather, they are required to be followed).  Consequently, where an appellant's brief contains numerous Rule 341 violations and, in particular, impedes our review of the case at hand because of them, it is our right to strike that brief and dismiss the appeal.  See *In re Marriage of Petrik*, 2012 IL App (2d) 110495, ¶ 38 (citing *Kic v. Bianucci*, 2011 IL App (1st) 100622, ¶ 23 (failure to follow Rule 341 may result in forfeiture of consideration of issues on appeal)); see also *Marriage of Petrik*, 2012 IL App (2d) 110495, ¶ 38 (quoting *Kic*, 2011 IL App (1st) 100622, ¶ 23 (quoting *Thrall Car Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719 (1986)) (ultimately, we are " ' "not a depository in which the appellant may dump the burden of argument and research" ' " for her cause on appeal).

¶ 15        In the instant cause, petitioner's brief does not comply with Rule 341(h) in several important respects.  That is, save for a general citation to the Act, petitioner's brief does not contain any "Points and Authorities" statement outlining the points argued and authorities cited in the Argument (see Rule 341(h)(1)); it does not contain a viable statement of

_____

Commission that it would not have had jurisdiction to consider such claims.  See, *e.g.*, *Kalush v. Illinois Dep't of Human Rights Chief Legal Counsel*, 298 Ill. App. 3d 980, 991 (1998) (the Commission does not have jurisdiction over new assertions not timely raised in the petitioner's charge filed with the Department).  However, we note, again, that the filings in the instant appeal have consistently, and only, been based upon the protected class of race.

jurisdiction (see Rule 341(h)(4)); and, while she does provide scant citation to a few pages of the record, petitioner provides essentially no argument, let alone any citation to legal authority for such (see Rule 341(h)(7)).  Thus, it is within our prerogative to strike her brief and dismiss this appeal based on her failure to comply with the applicable rules of appellate procedure.  See *Holzrichter v. Yorath*, 2013 IL App (1st) 110287, ¶ 80; accord *Marriage of Petrik*, 2012 IL App (2d) 110495, ¶ 38 (the reviewing court has every right to strike a plaintiff's appellate brief and dismiss her cause when Rule 341 is violated so as to impede review).  However, we note that, because we have the benefit here of a cogent brief from respondent the Commission, we choose, in our discretion, to reach the merits of the appeal.  See *North Community Bank v. 17011 South Park Ave., LLC*, 2015 IL App (1st) 133672, ¶ 14 (reviewing merits of the appeal despite appellant's numerous violations of Supreme Court Rule 341(h)).

¶ 16     Under the Act, it is "a civil rights violation for any person on the basis of unlawful discrimination to * * * [d]eny or refuse to another the full and equal enjoyment of the facilities, goods, and services of any public place of accommodation."  775 ILCS 5/5-102(A) (West 2018).  "Unlawful discrimination" is defined in part as discrimination against a person because of her race or skin color.  775 ILCS 5/1-103(Q) (West 2018).

¶ 17     Where a petitioner brings a charge under the Act, the Department shall conduct an investigation to determine whether the allegations are supported by substantial evidence.  See 775 ILCS 5/7A-102(C)(1) (West 2018).  "Substantial evidence is evidence which a reasonable mind accepts as sufficient to support a particular conclusion and which consists of more than a mere scintilla" of proof.  775 ILCS 5/7A-102(D)(2) (West 2018).  If the Department determines there is no substantial evidence supporting the charge, it shall dismiss

the charge. See 775 ILCS 5/7A-102(D)(3) (West 2018). The petitioner may then either commence a civil action in circuit court or, as petitioner did here, file a request for review of the dismissal with the Commission. 775 ILCS 5/7A-102(D)(3) (West 2018).

¶ 18    A final order of the Commission is judicially reviewed by our Court under the abuse of discretion standard of review. See 775 ILCS 5/8-111(B)(1) (West 2018); *Young v. Illinois Human Rights Comm'n*, 2012 IL App (1st) 112204, ¶ 32. Under this standard, we will not disturb the Commission's decision unless it is arbitrary or capricious. See *Young*, 2012 IL App (1st) 112204, ¶ 33. A decision is arbitrary or capricious if it contravenes the legislature's intent, fails to consider a crucial aspect of the problem, or offers an impossible explanation contrary to agency expertise. See *Owens v. Dep't of Human Rights*, 403 Ill. App. 3d 899, 917 (2010).

¶ 19    We review the final order of the Commission, not the Department's decision. See *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 180 (1989). The Commission's findings of fact "shall be sustained unless the court determines that such findings are contrary to the manifest weight of the evidence." 775 ILCS 5/8-11(B)(2) (West 2018). This deference to the Commission's findings of fact is particularly true of the credibility determinations it makes. See *Zaderaka*, 131 Ill. 2d at 180; accord *Folbert v. Dep't of Human Rights*, 303 Ill. App. 3d 13, 25 (1999). A reviewing court may not reweigh the evidence or substitute its judgment for that of the Commission, and abuse of discretion will be found only where no reasonable person could agree with the decision rendered. See *Young*, 2012 IL App (1st) 112204, ¶ 33.

¶ 20    In analyzing claims of public accommodation discrimination under the Act, we are guided by federal case law relating to analogous federal anti-discrimination statutes, here,

11

Title II of the Civil Rights Act of 1964, which in relevant part protects an individual's "full and equal enjoyment" of services and facilities of any place of public accommodation without discrimination on the ground of race or color (42 U.S.C. § 2000a (2000)). See *Zaderaka*, 131 Ill. 2d at 178 (analyzing an employment discrimination action using federal case law addressing claims under Title VII of the Civil Rights Act of 1964); accord *Owens*, 403 Ill. App. 3d at 918.

¶ 21    Because petitioner in the instant cause has provided no direct evidence of discrimination, we must analyze her claim using the three-part test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). See *Zaderaka*, 131 Ill. 2d at 178-79 (our state courts have adopted this analytical framework as set forth by the United States Supreme Court decisions addressing such claims); *Young*, 2012 IL App (1st) 112204, ¶ 34. Under this test, first, petitioner has the burden to establish a *prima facie* case of unlawful discrimination by a preponderance of the evidence. See *Young*, 2012 IL App (1st) 112204, ¶ 34; see, *e.g.*, *Zaderaka*, 131 Ill. 2d at 178-79. If she meets this burden, a rebuttable presumption of unlawful discrimination arises. See *Young*, 2012 IL App (1st) 112204, ¶ 36; see, *e.g.*, *Zaderaka*, 131 Ill. 2d at 179. Second, to rebut this presumption, respondent Loyola must articulate a legitimate, nondiscriminatory reason for its decision. See *Young*, 2012 IL App (1st) 112204, ¶ 36; see, *e.g.*, *Zaderaka*, 131 Ill. 2d at 179 (respondent need only articulate such a reason and is not required to prove it). Third, if Loyola does so, the presumption of unlawful discrimination falls and the burden shifts back to petitioner to prove by a preponderance of the evidence that Loyola's articulated reason was untrue and merely a pretext for discrimination. See *Young*, 2012 IL App (1st) 112204, ¶ 34; see, *e.g.*, *Zaderaka*,

131 Ill. 2d at 179. Under this test, the ultimate burden remains with petitioner at all times. See *Zaderaka*, 131 Ill. 2d at 179; accord *Owens*, 403 Ill. App. 3d at 919.

¶ 22    With respect to the first part of the *McDonnell* test, to establish a *prima facie* case for public accommodation discrimination, petitioner here must show she: (1) is a member of a protected class; (2) attempted to exercise her right to full benefits and enjoyment of Loyola's services; (3) was denied those benefits and enjoyment; and (4) was treated less favorably than similarly situated persons outside her protected class. See *McCoy v. Homestead Studios Hotels*, 390 F. Supp. 2d 577, 583-85 (S.D. Tex. 2005).

¶ 23    We hold that the Commission did not abuse its discretion in finding petitioner failed to establish a *prima facie* case of public accommodation discrimination based on her race. The parties do not dispute that Loyola is a public place of accommodation under the Act, that petitioner was a member of a protected class due to her race, and that Loyola refused to renew petitioner's alumni card which granted her access to certain Loyola facilities. However, petitioner failed to present any evidence with respect to the last element required to establish a *prima facie* case, namely, that she was treated less favorably than similarly situated Loyola alumni outside her protected class seeking renewal of their alumni cards. In contradistinction, as the Commission pointed out, she presented no evidence that other Loyola alumni outside her protected class were permitted to renew their alumni cards after exhibiting inappropriate behavior at Loyola facilities.

¶ 24    Although petitioner insisted to the Department and Commission that she "was the only American minority lite skinned and black female that was refused her renewal alumni card" and that "she was treated less than the white alumni, whom never were denied their alumni renewal card," she provided no evidence to support either assertion. Indeed, she did not

13

present evidence of a single Loyola alumnus who engaged in similarly disruptive or inappropriate behavior, leading to concerns and complaints from Loyola employees, who was thereafter granted renewal of his or her Loyola alumni card. Rather, and as we have already described, the evidence provided by Martin and Loyola during the Department investigation showed that three particular non-black Loyola alumni (Barbara A. Kronau-Sorensen, Mickey Nichols, and Kevin Kutsch), all of whom were outside her protected class, were also denied alumni card renewals because they did not comply with Loyola's code of appropriate behavior at its facilities, just like petitioner. Therefore, petitioner did not meet her evidentiary burden to prove this necessary element of a *prima facie* claim of unlawful public accommodation discrimination based on her race by a preponderance of the evidence. See *Young*, 2012 IL App (1st) 112204, ¶¶ 47-48 (discrimination claim requires evidence of a similarly situated person in comparable circumstances). And, accordingly, the Commission did not abuse its discretion in sustaining the dismissal for lack of substantial evidence on this basis.

¶ 25    Even if it could somehow be concluded that petitioner did meet her burden of establishing a *prima facie* case (which it cannot), and, thus, a rebuttable presumption of unlawful discrimination can be said to have arisen here (which it did not), we note for the record that Loyola articulated a legitimate, nondiscriminatory reason for its decision to deny petitioner the renewal of her alumni access card. Here, the record shows that Loyola employees Martin and Houston, who never spoke with petitioner in person and never knew her race, explained to petitioner that the reason her alumni card would not be renewed was because of the alerts that appeared in the Loyola database as a result of petitioner's inappropriate behavior toward McCray during the 2005 incident and her conduct at the Water

14

Tower facility in November 2006, as well as other documented occurrences of inappropriate behavior she perpetuated against other staff, including her incessant phone calls, threatening voicemails, use of profanity, impersonation of positions she did not hold, and falsehoods about authorizations for renewal she did not have. Moreover, Loyola presented various documents outlining its rules for behavior at its campuses, including its Equal Opportunity, Affirmative Action and Non-Discrimination policy, Code of Conduct, University Community Standards, Campus Safety Department mission statement, Message from the Director and building and facilities/alumni library access policies—all stating that Loyola does not discriminate on the basis of race, requires community members to demonstrate respect for the rights of others and to behave accordingly while refraining from obstructing or disrupting normal facility activities, and strictly prohibits abusive, disruptive and disorderly conduct in order to maintain a safe and secure environment for all. The evidence presented at the fact-finding conference made clear that petitioner's race had nothing to do with Loyola's refusal to renew her alumni card. Rather, Loyola's decision was based on petitioner's inappropriate behavior at its facilities, from which it determined petitioner would not be able to abide by Loyola's various codes of conduct should her card be renewed.

¶ 26    Continuing along these hypothetical lines, assuming petitioner established a *prima facie* case, and with Loyola then having articulated a reason for its actions, any presumption of unlawful discrimination would fall here and the burden would shift back to petition to prove, by a preponderance of the evidence, that Loyola's reason was a pretext for discrimination. Just as with the other required elements of her cause, this, she cannot do. She provides absolutely no evidence of a pretext for discrimination here by Loyola against her, other than her own speculation that Martin, Houston and other Loyola staff had animus toward her due

15

to her race and skin color. See *Folbert*, 303 Ill. App. 3d at 25 ("[a] petitioner's discrimination charge consisting of mere speculation and conjecture does not constitute substantial evidence"). Again, not only was petitioner's race not included in her database information, but neither Martin nor Houston ever met petitioner in person (with petitioner herself admitting as much), and the investigation concluded that they were entirely unaware of her race. Therefore, petitioner has failed to establish that Loyola's refusal to renew her alumni card was due to any discriminatory reason.

¶ 27    Ultimately, the Commission's dismissal of petitioner's charge of public accommodation discrimination for lack of substantial evidence was proper. Petitioner failed to meet the required elements of a *prima facie* case and, even if such a case could be made, Loyola provided a non-pretextual reason for its refusal to renew her alumni card which petitioner cannot show was untrue. Having failed to present any substantial evidence to satisfy any of the burdens required of her, the Commission properly dismissed petitioner's charge.

¶ 28                                    CONCLUSION

¶ 29    Accordingly, for the foregoing reasons, we affirm the Commission's order sustaining the Department's dismissal of petitioner's charge for lack of substantial evidence.

¶ 30    Affirmed.